5:26CV01410BYP

# LYNN M. TODARO
## STARK COUNTY CLERK OF COURTS
## APPEARANCE DOCKET

CASE NUMBER   **2026CV01136**
CASE TYPE   OTHER CIVIL
JUDG   HON. NATALIE HAUPT
COURT ROOM   2
DATE OPEN:   5/28/26
DATE CLOSE:   6/24/26

FILED

JUN 30 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
AKRON

**HALEY KEDRA, PLAINTIFF**
3519 YELLOW CREEK AVE NW  MASSILLON,OH

MICHAEL FORTNEY
3475 RIDGEWOOD ROAD
AKRON          , OH   44333
(330) 376-3300

**BLAKE KEDRA, PLAINTIFF**
3519 YELLOW CREEK AVE NW  MASSILLON,OH

MICHAEL FORTNEY
3475 RIDGEWOOD ROAD
AKRON          , OH   44333
(330) 376-3300

**NVR INC, DEFENDANT**
C/O CORPORATION SERVICE COMPANY 1160 DUBLIN RD STE 400
COLUMBUS,OH

| | |
|---|---|
| 5/28/26 | DEPOSIT RECEIVED FROM STARK & KNOLL - 30724 RECEIPT NO. CV522390 IN THE AMOUNT OF $323.00 |
| 5/28/26 | COMPLAINT FILED SUMMONS AND COPIES OF COMPLAINT SENT TO NVR INC BY CERTIFIED MAIL TRACKING NO: 9414814903680975382238; (###432152026CV01136000!!!); |
| 5/28/26 | DESIGNATION FORM FILED |
| 6/16/26 | SERVICE COMPLETE FOR SERVICE ISSUED 05-28-2026 CERTIFIED MAIL TO NVR INC C/O CORPORATION SERVICE COMPANY 1160 DUBLIN RD STE 400 COLUMBUS OH 43215 ON 06-08-2026 |
| 6/24/26 | NOTICE OF REMOVAL TO THE U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| 6/25/26 | CERTIFIED COPY OF NOTICE OF REMOVAL OF CASE AND ALL ORIGINAL PLEADINGS SENT TO US DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO BY CERTIFIED MAIL TRACKING NO: 9414814903680975394323; (###443082026CV01136001!!!); |

**Total Receipts**   **323.00**
**Total Costs**   **228.56**
**Balance**   **94.44**

**IN THE COURT OF COMMON PLEAS**
**STARK COUNTY, OHIO**

| | | |
|---|---|---|
| **BLAKE KEDRA, et al.** | ) | |
| | ) | CASE NO.: 2026-CV-01136 |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | |
| | ) | **JUDGE NATALIE R. HAUPT** |
| **NVR, INC.** | ) | |
| | ) | |
| | ) | |
| *Defendant.* | ) | **DEFENDANT'S NOTICE OF** |
| | ) | **REMOVAL** |
| | ) | |
| | ) | |

PLEASE TAKE NOTICE that on June 22, 2026, Defendant NVR, Inc. caused this action to be removed to the U.S. District Court for the Northern District of Ohio, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, as reflected in the attached copy of the Notice of Removal and docket sheet (**Exhibit A**).

Respectfully submitted,

*/s/ Ryan W. Gillespie*
David D. Yeagley (0042433)
Ryan W. Gillespie (0102606)
**UB GREENSFELDER LLP**
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113-1448
(216) 583-7000
(216) 583-7001 (Fax)
dyeagley@ubglaw.com
rgillespie@ubglaw.com

*Attorneys for Defendant NVR, Inc.*

A TRUE COPY TESTE:
LYNN M. TODARO, CLERK
By *Hannah 3* Deputy
Date 6/25/26

## CERTIFICATE OF SERVICE

I certify that on June 23, 2026, a copy of *Defendant's Notice of Removal* was filed with the

Court via Fed Ex. Notice and a copy of this filing will be sent to Plaintiffs' counsel via email at

the following address:

Michael R. Fortney
FORTNEY LAW, LLC
300 Weatherstone Dr. #303
Wadsworth, OH 44281
(330) 619-8502
mike@ohiolienlawyer.com

*Counsel for Plaintiffs*

/s/ Ryan W. Gillespie
*One of the attorneys for Defendant NVR, Inc.*

2

# EXHIBIT A

(Federal Notice of Removal and Docket Sheet)

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **BLAKE KEDRA** ) <br> 3519 Yellow Creek Ave. NW ) <br> Massillon, Ohio 44647 ) <br> ) <br>     and ) <br> ) <br> **HALEY KEDRA** ) <br> 3519 Yellow Creek Ave. NW ) <br> Massillon, Ohio 44647 ) <br> ) <br>     *Plaintiffs* ) <br> ) <br> v. ) <br> ) <br> **NVR INC.** ) <br> c/o Corporation Service Company, Agent ) <br> 1160 Dublin Road, Suite 400 ) <br> Columbus, Ohio 43215 ) <br> ) <br> ) <br>     *Defendant.* ) | CASE NO.: <br><br><br><br><br><br><br> **DEFENDANT'S NOTICE OF REMOVAL** |

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendant NVR, Inc. ("Defendant") gives notice of the removal of this action from the Stark County, Ohio Court of Common Pleas, Case No. 2026-CV-01136, to the United States District Court for the Northern District of Ohio, Eastern Division. As ground for removal, Defendant states the following:

1.     On or about May 28, 2026, Plaintiffs filed an action styled *Blake Kedra et al. v. NVR, Inc.* bearing Case No. 2026-CV-01136 in the Stark County, Ohio Court of Common Pleas (the "State Action"). Defendant NVR, Inc. was served with the Summons and Complaint for the State Action on June 9, 2026. A copy of the Summons, Complaint, and Notice of Service of Process is attached hereto as **Exhibit A**. To the best of Defendant's knowledge, the attached

documents constitute all process, pleadings, notices, and orders which have been filed in said case today.

2. Without admitting any facts alleged in the Complaint, or that the Complaint states any claim for relief, Plaintiffs purport to bring common law and statutory claims against Defendant for certain alleged actions, omissions, and/or wrongdoing involving the sale of a lot and construction of a new home to Plaintiffs. Specifically, Plaintiffs assert claims for breach of contract, violations of the HCSSA, fraud, and declaratory judgment.

3. This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b). Defendant was served with the Summons and Complaint on June 9, 2026, via certified mail through their registered agent. This Notice of Removal is filed within thirty (30) days of service and is therefore timely.

4. Defendant is entitled to remove this action to this Court pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties. Plaintiffs are citizens of Stark County, Ohio. Defendant NVR, Inc. is a Virginia Corporation with its principal place of business in the Commonwealth of Virginia.

5. Based on the allegations in the Complaint, Plaintiffs are seeking to recover in this action an amount in excess of $75,000. Plaintiffs allege actual economic damages "consist[ing] of the purchase price of the home"—$294,150.00—"plus other costs associated with the home, including interest paid on Plaintiffs' loan." (Compl., ¶50; Ex. 1, p. 1.) In addition, Plaintiffs seek at least $10,000 in noneconomic damages, attorneys fees, and costs. (Compl., Prayer for Relief ¶¶ (1)-(6).

6.    Written notice of the filing of this Notice of Removal shall be filed with the Clerk of court of the Stark County Court of Common Pleas and served on all parties pursuant to 28 U.S.C. § 1446(d).

7.    Defendant reserves, without admission or waiver herein, all of its defenses to Plaintiffs' Complaint.

Respectfully submitted,

/s/ Ryan W. Gillespie
David D. Yeagley (0042433)
Ryan W. Gillespie (0102606)
**UB GREENSFELDER LLP**
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113-1448
(216) 583-7000
(216) 583-7001 (Fax)
dyeagley@ubglaw.com
rgillespie@ubglaw.com

*Attorneys for Defendant NVR, Inc.*

## CERTIFICATE OF SERVICE

I certify that on June 22, 2026, a copy of *Defendant's Notice of Removal* was electronically

filed via the Court's CM/ECF system.  Notice and a copy of this filing will be sent to counsel of

record for all parties via the Court's CM/ECF system and via email upon Plaintiffs' counsel at the

following address:

Michael R. Fortney
FORTNEY LAW, LLC
300 Weatherstone Dr. #303
Wadsworth, OH 44281
(330) 619-8502
mike@ohiolienlawyer.com

*Counsel for Plaintiffs*

/s/ *Ryan W. Gillespie*
*One of the attorneys for Defendant NVR, Inc.*

# EXHIBIT A



# CSC

## Notice of Service of Process

**null / ALL**
**Transmittal Number: 34253017**
**Date Processed: 06/10/2026**

| | |
|---|---|
| **Primary Contact:** | James M Sack Esq.<br>The Sack Law Firm P.C.<br>8270 Greensboro Dr<br>Ste 950<br>Mc Lean, VA 22102-4909 |
| **Electronic copy provided to:** | Karen Fettig<br>Nancy Ryan<br>Suzanne Lemley<br>Grant Willis<br>Valerie Patin |

| | |
|---|---|
| **Entity:** | NVR, Inc.<br>Entity ID Number 0451094 |
| **Entity Served:** | NVR, Inc. |
| **Title of Action:** | Blake Kedra vs. NVR, Inc. |
| **Matter Name/ID:** | Blake Kedra vs. NVR, Inc. (19400196) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Stark County Court of Common Pleas, OH |
| **Case/Reference No:** | 2026CV01136 |
| **Jurisdiction Served:** | Ohio |
| **Date Served on CSC:** | 06/09/2026 |
| **Answer or Appearance Due:** | 28 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Certified Mail |
| Sender Information: | Fortney Law, LLC<br>330-619-8502 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674  (888) 690-2882  |  sop@cscglobal.com

Clerk Legal Division
Stark County Clerk of Courts
P.O. Box 21160
Canton, OH 44701

**USPS CERTIFIED MAIL**

9414 8149 0368 0975 3822 38

2026CV01136
NVR INC C/O CORPORATION SERVICE
COMPANY
1160 DUBLIN RD
STE 400
COLUMBUS, OH 43215-1052

Shipper Ref:        2026CV01136
Reference 1:        2026CV01136
Reference 2:        432152026CV01136000

**IN THE COURT OF COMMON PLEAS, STARK COUNTY, OHIO**

## LYNN M. TODARO
### STARK COUNTY CLERK OF COURTS

BLAKE KEDRA ,ET AL

               PLAINTIFF,

     VS.                       CASE NUMBER :    **2026CV01136**

NVR INC                        ASSIGNED JUDGE :   **NATALIE R. HAUPT**

           DEFENDANT,

## SUMMONS

May 29, 2026

TO THE FOLLOWING NAMED DEFENDANT:

    NVR INC
    C/O CORPORATION SERVICE COMPANY
    1160 DUBLIN RD STE 400
    COLUMBUS, OH 43215

YOU HAVE BEEN NAMED A DEFENDANT IN A COMPLAINT FILED IN STARK COUNTY COURT OF COMMON PLEAS, STARK COUNTY COURT HOUSE, CANTON, OHIO 44702 BY:

    BLAKE KEDRA -
    3519 YELLOW CREEK AVE NW
    MASSILLON, OH 44647                            PLAINTIFF.

A COPY OF THE COMPLAINT IS ATTACHED HERETO. THE NAME AND ADDRESS OF THE PLAINTIFF'S ATTORNEY IS:

    MICHAEL FORTNEY
    3475 RIDGEWOOD ROAD
    AKRON, OH 44333

YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE UPON THE PLAINTIFF'S ATTORNEY, OR UPON THE PLAINTIFF, IF HE HAS NO ATTORNEY OF RECORD, A COPY OF AN ANSWER TO THE COMPLAINT WITHIN TWENTY-EIGHT DAYS AFTER THE SERVICE OF THIS SUMMONS ON YOU, EXCLUSIVE OF THE DAY OF SERVICE. YOUR ANSWER MUST BE FILED WITH THE COURT WITHIN THREE DAYS AFTER THE SERVICE OF A COPY OF THE ANSWER ON THE PLAINTIFF'S ATTORNEY.

IF YOU FAIL TO APPEAR AND DEFEND, JUDGMENT BY DEFAULT WILL BE RENDERED AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

LYNN M. TODARO
CLERK OF COURTS
STARK COUNTY, OHIO

H. BRAGG, DEPUTY CLERK

FILED

MAY 2 8 2026

LYNN M. TODARO
STARK COUNTY OHIO
CLERK OF COURTS

## IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

| | |
|---|---|
| BLAKE KEDRA<br>3519 Yellow Creek Ave. NW<br>Massillon, OH 44647 | CASE NO.   2026CV01136 |
| and | JUDGE          *Haupt* |
| HALEY KEDRA<br>3519 Yellow Creek Ave. NW<br>Massillon, OH 44647 | **COMPLAINT** |
| Plaintiffs, | |
| vs. | |
| NVR, INC.<br>c/o Corporation Service Company<br>1160 Dublin Road, Suite 400<br>Columbus, OH 43215 | |
| Defendant. | |

Plaintiffs Blake and Haley Kedra, through counsel, for their Complaint against Defendant

NVR, Inc., allege the following:

### INTRODUCTORY STATEMENT

1.    Plaintiff Blake Kedra is an individual and a resident of the State of Ohio, presently

residing at 3519 Yellow Creek Ave. NW, in Massillon, Ohio.

2.    Plaintiff Haley Kedra is an individual and a resident of the State of Ohio, presently

residing at 3519 Yellow Creek Ave. NW, in Massillon, Ohio.

3. Defendant NVR, Inc. is a corporation, organized and operating under the laws of the State of Virginia.

4. This Court has jurisdiction over this case pursuant to R.C. § 2305.01 because the amount at issue exceeds $15,000.

5. Venue is proper in this Court pursuant to Civ.R. 3(C) because the activities conducted by Defendant took place in Massillon, Ohio in Stark County.

## FACTS

6. Plaintiffs Blake and Haley Kedra (together "Plaintiffs") entered into a contract with Defendant NVR, Inc. (NVR) on or around September 18, 2022 (the "Contract").

7. A true copy of the Contract is attached to this Complaint as Exhibit 1.

8. The Contract called for Plaintiffs to purchase a lot and new home built by NVR (the "Project") on the lot at 3519 Yellow Creek Ave. NW (the "Property").

9. The Contract is a "home construction service contract" as that term is used in R.C. § 4722.01(C).

### NVR Misrepresentations Regarding Flood Plain

10. Prior to execution of the Contract, Plaintiffs retained the services of Austin Bates of eXp Realty as their real estate agent to assist with Plaintiffs' purchase of the Property, as well as the Contract.

11. Mr. Bates negotiated the purchase and Contract with NVR and NVR representatives.

12. As part of the negotiations described in the preceding paragraph, Mr. Bates specifically asked NVR whether the Property located at 3519 Yellow Creek Ave. NW was in a flood zone.

2

13.     After the question in the preceding paragraph, NVR and its representatives responded to Mr. Bates that the Property located at 3519 Yellow Creek Ave. NW was not in a flood zone.

14.     Relying on this statement, Plaintiffs agreed to enter into the Contract with NVR.

15.     Subsequently, work commenced and the Project was completed in February of 2023.

16.     Plaintiffs closed on the Property on or around February 23, 2023.

17.     Plaintiffs used NVR or its title company for the closing.

18.     At closing, Mr. Bates and Plaintiffs again asked if the Property was in a flood zone, and again they were told it was not, and Plaintiffs did not receive any Standard Flood Zone Determination Form as part of the closing on the Property.

19.     Once again, after receiving assurances and representations from NVR that the Property was not in a flood zone, Plaintiffs closed on the Property.

20.     Unbeknownst to Plaintiffs, the Property was in a flood zone all along, specifically NFIP Map Number 39151C 0187E.

21.     The only reason that Plaintiffs were able to determine that their home is in a flood zone was due to refinancing the property, when the new lender disclosed the flood zone through a Standard Flood Zone Determination Form.

22.     The Property was in a flood zone since at least September 29, 2011.

23.     NVR was aware that the Property was in a flood zone prior to Plaintiffs purchasing the Property.

24.     NVR was aware of the Flood Disaster Protection Act prior to entering into the Contract.

3

25. Pursuant to the Flood Disaster Prevention Act, NVR should have disclosed that Plaintiffs' home was in a flood zone prior to Plaintiffs purchasing the home.

26. NVR and its representatives misrepresented the flood zone status of the Property prior to and during Plaintiffs' purchase of the Project and Property.

**Completion of Development and Development of Water Issues.**

27. The Project was completed in February of 2023, and Plaintiffs moved into their new home shortly afterward.

28. At this time, Plaintiffs' home was the last home built in phase 2 of the development.

29. After February of 2023, NVR continued to build homes in the development and in the area uphill from the Property.

30. Specifically, phase 3 of the construction in the development involved NVR building additional homes on Yellow Creek Avenue to the east and north of the Property.

31. This section of Yellow Creek Avenue rises uphill from the Property.

32. Phase 3 of the development consisted of building 39 homes.

33. Each of these homes was built at a higher elevation than Plaintiffs' Property.

34. Phase 3 was completed on October 31, 2023.

35. On or around April 3, 2024, Plaintiffs experienced flooding at the Property.

36. The flooding described in the preceding paragraph caused water to intrude into Plaintiffs' home.

37. The amount of rain on or around April 3, 2024 was ordinary.

38. After the April 3, 2024 water intrusion event, Plaintiffs submitted a claim to NVR pursuant to the warranty provision contained in the Contract.

39. NVR sent representatives to the Property to investigate on or around April 15, 2024.

4

40. On or around April 5, 2025, Plaintiffs again experienced flooding at the Property.

41. The flooding described in the preceding paragraph caused water to intrude into Plaintiffs' home.

42. After the April 5, 2025 water intrusion event, Plaintiffs submitted a claim to NVR pursuant to the warranty provision contained in the Contract.

43. The amount of rain on or around April 5, 2025 was ordinary.

44. The water intrusion potential has not been fixed or alleviated by NVR.

45. This is because there is no way to fix the issue, due to the elevation of Plaintiffs' home relative to the overflow height of the pond behind Plaintiffs' property.

46. In order to permanently alleviate the issues that Plaintiffs face, the entire house would need to be elevated three to four feet.

### Plaintiffs' Damages

47. Plaintiffs' main damages come from being misled into the purchase of the Property.

48. Had Plaintiffs known about the flood plain designation, something that Plaintiffs and their realtor asked about multiple times before the purchase was finalized, Plaintiffs would not have purchased the Project and Property.

49. Instead, Plaintiffs were misled into purchasing a Project that should not have been built on the lot to begin with.

50. As such, Plaintiffs' damages consist of the purchase price of the home, plus other costs associated with the home, including interest paid on Plaintiffs' loan.

51. Additionally, Plaintiffs seek punitive damages against NVR related to the misrepresentations.

5

**Objectionable Terms in Contract**

52.     Defendants intend to rely on clauses from Section 14 of the Contract, but those clauses are objectionable and unreasonable when applied to a home construction contract such as this.

53.     Section 14 contains a one-year limitation clause and bar date, which is unreasonable.

54.     For instance, the first flood did not occur inside of one year, so it is unreasonable to not allow Plaintiffs to seek damages for breach of contract.

55.     Additionally, the flood at Plaintiffs' home most likely occurred due to changes in the flow of water as a result of NVR building and completing Phase 3 and Phase 4 of the development after the spring of 2023.

56.     Additionally, the misrepresentations of NVR were not discovered within one year, so it is unreasonable to allow NVR to perpetuate misrepresentations with the ability to fall back on a clause like this if their misrepresentations are not discovered within one year.

## FIRST CLAIM: BREACH OF CONTRACT

57.     Plaintiffs restate and reallege each of the preceding paragraphs as if fully restated herein.

58.     Plaintiffs fully performed their obligations under the Contract.

59.     NVR breached the Contract by failing to complete the Project in a workmanlike manner.

60.     NVR breached the Contract by building a home with a basement on a lot in a flood zone.

6

61.  NVR breached the Contract by designing a home with a basement on a lot in a flood zone.

62.  NVR breached the Contract by building a home with a basement at a lower elevation than the overflow height of the retention pond behind Plaintiffs' home.

63.  NVR breached the Contract by designing a home with a basement at a lower elevation than the overflow height of the retention pond behind Plaintiffs' home.

64.  Plaintiffs have been damaged by NVR's breaches in an amount to be proven at trial, but believed to exceed $25,000.

## SECOND CLAIM: R.C. § 4722 (HOME CONSTRUCTION SERVICE SUPPLIERS ACT)

65.  Plaintiffs restate and reallege each of the preceding paragraphs as if fully restated herein.

66.  Plaintiffs are each an "owner" as defined by R.C. § 4722.01(E).

67.  NVR is a "supplier" as defined by R.C. § 4722.01(D).

68.  The Contract is a "home construction service contract" as defined by R.C. § 4722.01(C).

69.  NVR committed multiple violations of R.C. 4722.03.

70.  NVR failed to perform the home construction service in a workmanlike manner, chiefly by building a home that fails to accomplish one of its chief purposes, being watertight.

71.  The allegation contained in the preceding paragraph is a violation of R.C. 4722.03(A)(1)(d).

72.  Section 6 of the Contract also contains a waiver of the implied warranties of workmanship and building in a workmanlike manner, meaning NVR made the performance of the home construction service contingent upon Plaintiffs waiving rights provided by R.C. 4722.

7

73. The allegation contained in the preceding paragraph is a violation of R.C. 4722.03(A)(4).

74. Pursuant to R.C. 4722.08(A), Plaintiffs are entitled to recover their actual economic damages, plus $5,000 in noneconomic damages for each violation of R.C. 4722.

75. Further, pursuant to R.C. 4722.08(D)(2), since NVR committed the acts knowingly, Plaintiffs are entitled to an award of attorney fees.

76. Plaintiffs have been damaged by Defendants and are entitled to recovery of their actual economic damages to be determined at trial, plus an award of at least $10,000 in non-economic damages, plus attorney's fees under the Home Construction Service Suppliers Act, R.C. § 4722.

## THIRD CLAIM: FRAUD

77. Plaintiffs restate and reallege each of the preceding paragraphs as if fully restated herein.

78. Prior to purchasing the home and the Property, Plaintiffs, through their representative, specifically asked NVR whether the Property was in a designated flood zone.

79. NVR explicitly told Plaintiffs' representative that the Property was not in a flood zone.

80. Only after learning that the Property was not in a flood zone did Plaintiffs agree to enter into the Contract.

81. Prior to closing on the Property, Plaintiffs again asked NVR whether the home was in a flood zone, and again Plaintiffs were told, by different NVR representatives, that the Property was not in a flood zone.

82. Based on those discussions, Plaintiffs felt comfortable closing on the Property.

8

83.     Unbeknownst to Plaintiffs, the Property was in a flood zone all along, specifically NFIP Map Number 39151C 0187E, a designation existing since at least September 29, 2011.

84.     The Contract was executed after September 29, 2011.

85.     The questions from Plaintiffs representative regarding the flood zone designation happened after September 29, 2011.

86.     NVR knew or should have known about the flood zone designation on the Property, specifically NFIP Map Number 39151C 0187E, since at least September 29, 2011.

87.     NVR is a national home builder that closes on loans through its own title company, in addition to working with other title companies.

88.     NVR is experienced with the Flood Disaster Protection Act.

89.     NVR is experienced with the Standard Flood Zone Determination Form.

90.     NVR's failure to provide Plaintiffs with a Standard Flood Zone Determination Form related to the Property was intentional, in order to alleviate Plaintiffs' concerns with the flood zone determination and ultimately cause Plaintiffs to enter into the Contract.

91.     NVR committed an additional misrepresentation prior to closing when it again lied to Plaintiffs about the flood zone status of the Property.

92.     NVR committed this misrepresentation in order to get Plaintiffs to close on the home and Property, which would cause NVR to directly receive a benefit, namely the purchase price of the Property.

93.     These acts amount to fraud by NVR.

94.     NVR is liable for fraud in an amount to be proven at trial, plus punitive damages in order to encourage NVR to act with truth and candor in the future.

9

## FOURTH CLAIM: DECLARATORY JUDGMENT

95.     Plaintiffs restate and reallege each of the preceding paragraphs as if fully restated herein.

96.     The "one (1) year limitation of action period and bar date" contained in Section 14 of the Contract is unreasonable, particularly in the context of construction, including residential home construction, and particularly when applied to misrepresentations and fraud that, if undiscovered for over one year, such as in this case, allows NVR to commit fraudulent acts without fear of litigation.

97.     As such, Plaintiffs request a judgment declaring this provision to be unreasonable, unlawful, and against the public policy of the State of Ohio.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Blake and Haley Kedra pray for the following relief:

(1)     As to the First Claim, a judgment declaring that Defendant NVR, Inc. breached the Contract, and finding Plaintiffs have been damaged by said breach in an amount to be proven at trial.

(2)     As to the Second Claim, a judgment declaring that Defendant NVR, Inc. violated Ohio's Home Construction Service Suppliers Act and, pursuant to R.C. § 4722.01, et seq., awarding Plaintiffs their actual economic damages to be proven at trial, plus at least $10,000 in noneconomic damages, plus the attorney's fees and costs incurred by Plaintiffs in prosecuting this action, to be decided at a subsequent hearing.

(3)     As to the Third Claim, a judgment declaring that Defendant NVR, Inc. committed fraud and awarding Plaintiffs punitive damages in a sufficient amount to deter NVR from committing fraud in the future, plus Plaintiffs' reasonable attorney fees.

10

(4)   As to the Fourth Claim, a declaratory judgment that the one year limitation of action period

and bar date contained in Section 14 of the Contract is unreasonable and unlawful.

(5)   Pre- and post-judgment interest at the statutory rate.

(6)   Such other relief as the Court deems just and proper under the circumstances.

Respectfully submitted,


*/s/Michael R. Fortney*
Michael R. Fortney (#0092325)
FORTNEY LAW, LLC
300 Weatherstone Dr. #303
Wadsworth, OH 44281
(330) 619-8502
mike@ohiolienlawyer.com

Attorney for Plaintiffs

11

Lot __1031__  Block ____
Date of Purchase Agreement _09/18/22_
MASSILLON,OH 44647



Community __Kenyon Creek__
Property  Address  __3519__ __YELLOW__ __CREEK__ __AVE__ __NW__

# OHIO PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (the "Agreement") is made as of the _18_ day of ____September____, 20_22_, by and between NVR, INC. t/a ___Ryan Homes___, a Virginia corporation ("Seller", "Us", "Our" or "We") and _____Blake__Kedra__ (purchaser) and _____Haley Green_____ (co-purchaser), presently residing at ____3055 Dewalt Dr Akron,OH 44312____ (telephone) ____(330) 808-3676____ (individually and collectively "Purchaser", "You" or "Your"). Our address and telephone number is 6770 W Snowville Rd, Ste 100, Brecksville, OH 44141, 440-584-4200_____. Our tax identification number is 54-1394360.

1.  **What You are buying.** The Property You are buying is:

Lot # ____00001031____, Section # _____, Block # _____, Subdivision __Kenyon  Creek_____(the "Community"), County or City of ___STARK_____, State of Ohio (the "Lot"), together with a home to be built on the Lot by Seller according to Seller's plan known as the _____BIRCH_____ Model, Set/Version #____BRH00-01____, including those options you have selected on the attached Master Selection Sheet. We will call this the "Home" and, with the Lot, the "Property" throughout this Agreement.

The Home may not be exactly like any of the model homes You may have seen. Also, the Home may be different than what You have seen in our advertisements and marketing information. The Home will be constructed as shown on the construction drawings (or blueprints), the grading plan, the record plat of subdivision, floor plans and other plans related to the construction of the Home, all of which You acknowledge that You reviewed, together with the options You selected on the Master Selection Sheet, which is incorporated into this Agreement by reference, and any Change Orders we mutually agree to during the time Change Orders are allowed to be submitted as provided in the Change Order Policy provided below. All of these together are called the "Plans and Specifications". You should also note that there are many ways to measure square footage so the final square footage of the Home may be different than that which is initially shown to You due to the method of measurement.

We offer You a wide variety of options to personalize Your Home to meet Your individual needs and requirements. Many of the components needed to construct the Home must be ordered well before construction begins and any changes after the date of this Agreement could affect the start of construction, loan approval process and closing of Your Home. In addition, many changes requested after the date of this Agreement require additional administrative, engineering, permit and loan approval actions, which may make the changes not only cost prohibitive, but can cause significant time delay.

All change requests are subject to Our approval. We are under no obligation to accept any change request beyond these change periods. We firmly adhere to this policy in order to best serve You and deliver the Home without delays.

The following is Our "Change Order Policy". Structural option change requests will be accepted within _10_ days after Your execution of this Agreement. All Change Order Addenda must be signed by You (if more than one Purchaser, all Purchasers must sign) and submitted to Your Sales Representative within this _10_ day time period or the change request will not be accepted or processed.

Non-structural option selections and/or change requests will be accepted as described below. All Change Order Addenda must be signed by the Purchaser (if more than one Purchaser, all Purchasers must sign) and submitted to Your Sales Representative within this time period or the change request will not be accepted or processed.

The final date that requests for flooring changes will be accepted is on or before: _____10/09/2022_____.
The final date that requests for wiring changes will be accepted is on or before: _____10/09/2022_____.
The final date that requests for all other non-structural changes will be accepted is on or before: _____10/09/2022_____.
☐ If the box to the left is checked, no changes will be allowed for this Property.

PURSUANT TO O.R.C. SEC. 4722.01, IF AT ANY TIME A HOME CONSTRUCTION SERVICE REQUIRES EXTRA COSTS ABOVE THE COST SPECIFIED OR ESTIMATED IN THE CONTRACT THAT WERE REASONABLY UNFORESEEN, BUT NECESSARY, AND THE TOTAL OF ALL EXTRA COSTS TO DATE EXCEEDS FIVE THOUSAND DOLLARS OVER THE COURSE OF THE ENTIRE HOME CONSTRUCTION CONTRACT, YOU HAVE A RIGHT TO AN ESTIMATE OF THOSE EXCESS COSTS BEFORE THE HOME CONSTRUCTION SERVICE SUPPLIER BEGINS WORK RELATED TO THOSE COSTS. INITIAL YOUR CHOICE OF THE TYPE OF ESTIMATE YOU REQUIRE:

_BK_  _HG_  Written Estimate          _BK_  _HG_  Oral Estimate

We make no representations or warranties about what other improvements may be constructed within the Community including home types, sizes, location or prices or the uses of property adjacent to the Property or to the Community. Any plans or information You may have seen for this Community are subject to change. Unless otherwise stated in an addendum to this Agreement, We have no obligation to provide You with copies of the preliminary or final site plans, the record plat, blueprints, general plan maps or other planning documents which may affect the planning and development of the surrounding area. Also, utility transformers are the sole responsibility of the utility companies and we have no authority to determine where utility transformers may be located on the Property or anywhere in the Community.

You acknowledge that the timing of construction, location, existence, size and features of tot lots, trails, community entry features and monuments, and recreational facilities within the Community (collectively the "Facilities"), if any, are subject to change. No representations as to the timing, location, size or features of such Facilities are part of this Agreement.

You are purchasing the Property as [CHECK BOX A, B, C OR D BELOW]:

☒  A.  Your principal residence and will occupy and reside in the Property.

OHMASTERSALEAGT. 112221
Print Date: 9/18/2022

Page 1 of 10

☐    B.    a model home pursuant to the attached Model Home Addendum.

☐    C.    a second home.

☐    D.    an investor. The Property will not be Your principal residence and You will not occupy and reside in the Property. You are not acquiring the Property as a second home. If this box is checked, Paragraph 4 does not apply to You.

You hereby represent and warrant to Us the truth and accuracy of the statements made above and You understand and agree that We are relying on the truth and accuracy of these statements as a material inducement to Our entering into this Agreement with You. If Your statements made above are found to be untrue or inaccurate, or if Your status changes prior to Settlement, You will be deemed to have checked the box above that truly and accurately reflects the circumstances involving Your purchase of the Property. In such event, We may require You to increase the Deposit, at Our discretion. Under such circumstances, You would be required to pay such Deposit increase to Us within ten (10) days after Our request for such additional Deposit is made. Your failure to fund any such increase of the Deposit shall be deemed to be a material breach of the Agreement.

2. **Sales Price and Payments.** You agree to pay to Seller for the Property, including the options listed on the Master Selection Sheet, the sum of $____294,150.00____ (the "Purchase Price") payable as follows:

     (a) Cash earnest money deposit upon Purchaser's signing of this Agreement..........................   $250.00____

     (b) An additional payment in cash due on or before ___11/17/2022___ ................................   $4,750.00____

     (c) The balance in immediately available funds to be electronically transferred to the agent conducting the Settlement on the Actual Settlement Date hereunder.....................................................................................................................

       $289,150.00____

     The term "Deposit" shall mean all amounts due from Purchaser to Seller pursuant to Paragraphs 2(a) and 2(b). Any checks accepted by Seller shall be subject to collection and payment. All refunds or credits to Purchaser of the Deposit shall be without interest, except as provided in Paragraph 13(b).

3. **Payment of Closing Costs and Cash Discount.** You are responsible for payment of all "Closing Costs" unless You are otherwise eligible for the Cash Discount as defined by this Paragraph and as permitted by applicable law.

"Closing Costs" are the fees and charges charged by Your lender and third parties related to the purchase and finance of your Home. Closing Costs include all charges due to Your lender, home insurance premiums, mortgage insurance premiums, title insurance premiums, Your attorney's fees, realtor commissions (unless We have agreed to pay these for You), all recordation fees and taxes (even if typically paid by a seller or grantor), and any other fees charged for the Settlement.

A Cash Discount is a credit applied toward the payment of Closing Costs. The Cash Discount cannot exceed the amount of Closing Costs due.

**You have the right to obtain a loan from any lender You choose.**

We have an affiliation with NVR Mortgage Finance, Inc. ("NVRM"). If You obtain Your mortgage loan through NVRM, You will be entitled to a Cash Discount of $5,800.00____ at Settlement.

**If You select a lender other than NVRM, You are not eligible to receive the Cash Discount.**

**If You select NVRM as Your lender You are eligible for the Cash Discount.**

4. **How You intend to pay the Purchase Price.** ☐ If the box to the left is checked, You are paying the Purchase Price in cash (i.e., no mortgage loan) in which case this Paragraph does not apply to You.

If the box above is not checked, You intend to apply for a mortgage loan to pay the Purchase Price at Settlement, less any amounts (such as the Deposit) that You pre-pay. In order for us to complete Your Home by the Estimated Settlement Date (which is given in Paragraph 9(a)), You are required to apply for a mortgage loan with a lender of Your choice within seven (7) days after You sign this Agreement. You are also required to diligently work with Your lender in good faith to obtain loan approval, which we will refer to in this Agreement as the "Loan Approval". While We will assist You in working with Your chosen lender, it is Your responsibility to respond to Your lender's request for information and meet all the conditions of Your loan application and the Loan Approval and to keep us informed of the status of Your application. You authorize Us to communicate with Your chosen lender and to disclose information regarding this transaction to the lender.

If You do not have Loan Approval within forty-five (45) days after the date of this Agreement (the "Loan Approval Period"), We will have the right to cancel this Agreement. If we believe You have not used good faith efforts to obtain Loan Approval, We will have the right to keep Your Deposit. If You did not obtain Loan Approval in spite of using Your good faith efforts to do so, then we will refund Your Deposit once You sign Our Mutual Release Agreement. Alternatively, We could decide to extend the Loan Approval Period. However, if We determine that You are not using good faith efforts to obtain Loan Approval during the extended Loan Approval Period, We would have the right to terminate the Agreement and keep Your Deposit.

Once You obtain Loan Approval, it is Your responsibility to meet all of the conditions required by Your lender in order for You to complete Settlement on the Actual Settlement Date (as shown in Paragraph 9(a)). Once We issue the Settlement Notice defined in Paragraph 9(a), no changes to the Loan Approval will be allowed. If the Loan Approval is terminated by the lender due to circumstances beyond your control, and You are unable to obtain another Loan Approval prior to the Actual Settlement Date, We will terminate this Agreement and refund the Deposit to You after You sign Our Mutual Release Agreement.

Notwithstanding any other provisions of this Agreement, We may at any time prior to Settlement make a good faith determination that Your lender will not be able to timely approve and fund Your Loan or that the conditions established by Your lender are unlikely to be satisfied timely. In that event We may terminate this Agreement and refund to You Your Deposit (once you execute Our Mutual Release Agreement) and this Agreement would be without further force and effect.

OHMASTERSALEAGT. 112221
Print Date: 9/18/2022

Page 2 of 10

We will provide a Mortgage Location survey (in compliance with the standards set forth in Ohio Administrative Code Section 4733-38, as amended) at Your expense if required by Your lender, however, such survey will not include the staking of the Lot boundaries unless otherwise provided by an addendum to this Agreement.

    **5. No Contingencies.** Unless otherwise provided by addendum attached hereto, this Agreement in no way is contingent upon the sale, rental, settlement or other disposition of any other property You own.

    **6. Limited Warranty.** You have received a copy of Seller's limited warranty ("Limited Warranty") prior to execution of this Agreement and you agree to accept the Limited Warranty as the sole warranty being given to You. The Limited Warranty is also available at http://myryanhome.com/Warranty.aspx. **THE LIMITED WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF FREEDOM FROM STRUCTURAL DEFECTS, WORKMANSHIP, WORKMANLIKE CONSTRUCTION, MERCHANTABILITY AND HABITABILITY, ALL OF WHICH PURCHASER HEREBY WAIVES.**

    **7. Right to Cure.** OHIO LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT OR COMMENCE ARBITRATION PROCEEDINGS FOR DEFECTIVE CONSTRUCTION AGAINST THE RESIDENTIAL CONTRACTOR WHO CONSTRUCTED YOUR HOME. AT LEAST SIXTY DAYS BEFORE YOU FILE A LAWSUIT OR COMMENCE ARBITRATION PROCEEDINGS, YOU MUST PROVIDE THE CONTRACTOR WITH A WRITTEN NOTICE OF THE CONDITIONS YOU ALLEGE ARE DEFECTIVE. UNDER CHAPTER 1312 OF THE OHIO REVISED CODE, THE CONTRACTOR HAS AN OPPORTUNITY TO OFFER TO REPAIR OR PAY FOR THE DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER THE CONTRACTOR MAKES. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER STATE LAW, AND FAILURE TO FOLLOW THEM MAY AFFECT YOUR ABILITY TO FILE A LAWSUIT OR COMMENCE ARBITRATION PROCEEDINGS.

    8. **Preconditions to Construction.** We are not required to start construction on the Home until We receive all of the following:
        (a) All cash payments as required in Paragraph 2 above within the time provided;
        (b) A written Loan Approval as required within the time period indicated in Paragraph 4 above (unless Paragraph 4 does not apply to You in which case, Loan Approval is not a precondition to construction);
        (c) Your selection of all options; and
        (d) All necessary governmental approvals and permits.
    In the event We elect to commence construction prior to the receipt of (a), (b) or (c) above, You would still be obligated to complete those items.

    9. **Completion of Construction; Settlement and Delivery.**
        (a) Construction is estimated to commence on or about __12/01/2022__ and be completed on or about __02/01/23__ at which time settlement on the Property ("Settlement") shall occur (the "Estimated Settlement Date"). However, there are many variables which must be taken in consideration when scheduling Settlement, many of which We have no control over, such as Your Loan Approval, issuance of permits and the weather. Settlement will be scheduled by Us and We will give You no less than ten (10) days written notice (the "Settlement Notice") of the actual date of Settlement. We will call this the "Actual Settlement Date". At the time of Settlement, You will receive the keys You will be able to move into Your new Home. If there is a need to reschedule Settlement after issuance of the Settlement Notice, then any notice as to the rescheduled date and time will be provided to You no later than two (2) days prior to the Actual Settlement Date. If You do not complete Settlement on the Actual Settlement Date, then You will be in default of this Agreement and We would have the rights and remedies outlined in Paragraph 13(a) against You.
    We are required to complete Settlement on Your Home within two (2) years after the date of this Agreement. If we do not complete Settlement within two (2) years, then you have the rights and remedies against us outlined in Paragraph 13(b). However, if Settlement is not completed by that deadline due to Your breach or default under this Agreement, or some other reason not of Our control (see Paragraph 9(b) for a list of such reasons), then Settlement could be extended beyond the two years and We would not be in default.
    If, prior to Settlement, We believe that You are no longer willing to complete Settlement, We may ask You to provide a written statement saying that You will complete Settlement. If You do not provide such a statement, or if You otherwise give Us notice that you do not intend to complete Settlement, then You would be in default of this Agreement and We would have certain rights and remedies against You as outlined in Paragraph 13(a).
        (b) There may be delays in construction or Settlement from causes beyond Our control, including, without limitation, acts or defaults by You; labor disputes of any kind; inability to procure materials or unusual delay in deliveries; delays or actions caused by government authority; government refusal to issue any necessary permits; delays caused by utility service providers; war, acts of terrorism, civil commotion or other casualty; damage caused by fire, earthquake, flood, hurricane or severe weather; disruptions resulting from a health crisis, such as an epidemic or pandemic; or any form of act of God. If We are delayed, hindered or adversely affected by any of the foregoing events or any other events of a similar nature, whether or not the underlying event is foreseeable at the time of execution of this Agreement, the time for complete performance of this Agreement by Us (to satisfy the Interstate Land Sales Full Disclosure Act ("ILSA")) and for Settlement shall be extended for a period of time equal to the length of the delay attributable to such cause, and We would not be liable for damages for any such delay or failure to perform.
        (c) You agree to complete Settlement when the Property is Substantially Complete. Substantially Complete shall be defined as the issuance by the local jurisdiction of a temporary or conditional certificate of occupancy or other document permitting residential use (the "Residential Use Permit") even if some items such as landscaping, driveways, final grading, exterior painting, and other minor punch-list items may not be completed. We will complete any such uncompleted items as soon as practicable, weather conditions permitting. In order to do so, We reserve the right to enter onto the Property after Settlement to complete such exterior items without Your prior approval.
        (d) You have the right to schedule a private home inspection ("Inspection") of the Property by an independent home inspector at Your expense. However, the results of the Inspection must be received by Us no later than three (3) business days prior to the scheduled Settlement date. The Inspection must be performed by a full member in good standing of a national home inspection association in accordance with the ethical standards and code of conduct or practice of that association. Any home inspector must have insurance coverage acceptable to Us prior to entering the Property. You unconditionally indemnify and hold Us harmless from any

injury to person or property occurring as a result of the Inspection. If You elect to hire an independent private home inspector, We will reasonably cooperate in scheduling an Inspection; however, the Inspection must be scheduled with no less than 48 hours advance notice to Us and the Inspection must take place during normal construction working hours. The Inspection must be coordinated with Us and may not interfere with construction or delay the construction schedule. Any deficiencies identified by the Inspection shall be promptly submitted to Us in writing along with a certified report of the home inspector. In the event any deficiency identified by the Inspection is considered by Us to be a violation of any local codes or acceptable construction practices as defined in the Limited Warranty, We will correct such deficiency in a timely manner and the correction of any such deficiency shall not delay Settlement unless the deficiency is of such a nature as to make the Property uninhabitable.

(e) We will have the right to enter upon the Property at any time after Settlement for the purpose of making exterior changes to the Property, including but not limited to grading and drainage system changes and the removal or planting of trees.

(f) If We encounter any unusual or difficult ground conditions on the Lot, We may offer You one or more or the following options: (i) choosing an alternative lot from among those We are offering in the Community, if one is available or (ii) signing a Mutual Release Agreement and receiving a refund of the Deposit You have previously paid, thereby terminating this Agreement.

(g) Except as set forth in subsection (d) of this Paragraph 9, You may not have access or entry to the Property or the construction site during construction, nor may You store any possessions on the Property or the construction site prior to Settlement. Any violation of this provision may, at Our election, be considered a default of this Agreement and, in addition to any other remedies available to Us, We may terminate this Agreement and keep Your Deposit as fixed and liquidated damages. If You violate this provision, You will be deemed to be trespassing and We assume no liability or responsibility for any injuries suffered by You while on the Property or construction site, and You indemnify Us from any and all injury, cost, loss or damage arising from Your actions.

10. **Our Changes.**

(a) We have the right to substitute similar materials of substantially equivalent quality.

(b) We reserve the right to make changes in the Plans and Specifications for purposes of mechanical installations, building code and site requirements, and reasonable architectural design improvements subsequent to the date of this Agreement.

(c) We will determine, at Our discretion, the location and ground elevation of the Home and the necessity, if any, to reverse the plan of the Home to conform to the existing contours of the land.

11. **Payment of Taxes and Utility Charges.** All taxes and utility charges, including, without limitation, sewer and water benefit charges and other public dues, taxes and charges will be adjusted to the Actual Settlement Date based upon the most recent tax bill and You will thereafter assume responsibility for such charges. If no split figures are available, no proration shall be made. You will assume and be solely responsible for payment of all taxes and assessments that are not yet due and payable as of the Actual Settlement Date and We will not provide any reimbursement or credit for any such taxes or assessments. It is also Your responsibility to have all utility services to the Property transferred into Your name effective no later than the Actual Settlement Date. No funds shall be escrowed at Settlement for utility charges.

Local jurisdictions typically assess residential property owners for the cost of public improvements such as roads, water and sewer. Many times, the information regarding the assessments is not known until after the improvements are constructed and the local jurisdiction has a certification from the engineer and contractors of the total costs expended on the improvements. This amount is then assessed against all of the homeowners who benefit from the improvements. These assessments are typically included as part of the property tax bill. Since these improvements, from planning through to completion, typically take years, additional houses which benefit from the improvements may be approved and/or built, or, alternatively, some planned projects may never come to fruition. This would affect the amount of the assessment since it is based upon the number of properties benefiting from the improvements. We make no representations or warranties regarding any assessments which may affect the Property, either now or in the future.

12. **Title.**

(a) At Settlement, title to the Property shall be conveyed by Limited Warranty Deed and shall be good and marketable, fully insurable by a reputable American Land Title Association (ALTA) title insurance company subject, however, to (i) easements, covenants, conditions and restrictions of record, (ii) any statutory lien for ad valorem taxes which are not yet levied, published, due or payable, (iii) any homeowner's association documents restricting the use and enjoyment of the Property, (iv) zoning and other applicable laws and regulations, and (v) such facts as an accurate survey and personal inspection of the Property would reflect, provided same do not render title uninsurable or unmarketable. The Property is not subject to any ground rent. If title cannot be delivered at Settlement in compliance with this Paragraph, We may determine that we will remedy such title defects prior to Settlement at Our sole expense, in which case the time herein specified for Settlement will be extended for the period of time necessary for such action. However, if We cannot perfect title or are unable to perfect title after taking reasonable legal actions, We will promptly notify You in writing and You will have the right, at Your option, to either (i) terminate this Agreement by sending Us written notice of Your decision within ten (10) days after Your receipt of Our notice, or (ii) You can waive any title defects and proceed to Settlement. At the time Settlement occurs, You will be deemed to have accepted title and We will be expressly released from all liability or damages by reason of any defect in or failure of title. If You terminate the Agreement for title defects, We will refund the Deposit to You once You execute Our Mutual Release Agreement.

(b) If easements are required after Settlement, You agree to cooperate with Us, for no additional consideration (monetary or otherwise) in executing and delivering any and all documents related to such easements.

(c) You are purchasing a completed home from Us and We are not acting as a contractor for You in the construction of the Home. You acquire no right, title or interest in the Property or the Home by virtue of this Agreement except the right and obligation to purchase the completed Home and Lot in accordance with the terms of this Agreement. Equitable title shall remain vested in Us until delivery of the deed at Settlement.

13. **Default.**

(a) **Default-Purchaser.** If You fail to make full and timely Settlement or if You otherwise breach any provision under this Agreement, the damages that We will or may suffer as a result of Your breach or default are uncertain and not reasonably calculable with certainty. Accordingly, We reserve the right to retain the Deposit as liquidated damages and not as a penalty, in which event You and We will be relieved from further liability hereunder. In the alternative, We may retain the Deposit for the payment of damages and pursue such legal and/or equitable remedies We may have on account of Your breach or default, including, but not limited to, specific performance. In the event You fail to take title to the Property on the Actual Settlement Date as required in this Agreement, We may, in Our sole discretion, agree to extend the time of Settlement. In the event You do not settle on the Actual Settlement Date, regardless of whether or not We agreed to extend the time of Settlement, You will be responsible for payment of a late settlement charge computed at the rate of 1% of the unpaid balance of the Purchase Price per month beginning on the originally scheduled Settlement Date through the rescheduled Actual Settlement Date. No interest rate charged herein shall be in excess of that permitted

by law. If there are multiple purchasers, each of You shall be jointly and severally liable hereunder. In the event that You are in breach or default under this Agreement, You will be responsible for reasonable attorneys' fees We incur in enforcing this Agreement.

(b) **Default-Seller.** We will be deemed to be in default upon Our failure (1) to complete Settlement as required hereunder; or (2) to perform the obligations required to be performed by Us hereunder prior to Settlement, unless You are in default. Your sole and exclusive remedy if We default shall be to recover Your Deposit (as defined in Paragraph 2 and to the extent previously paid to Us) plus interest on Your Deposit at the legal rate since the date of Our breach or default, plus the sum of One Thousand Dollars ($1,000.00) as liquidated damages and not a penalty (which sum is a reasonable estimate of actual damages which cannot be forecasted with certainty), in return for which You and We shall be automatically released from this Agreement and You would have no further rights to the Property. If the limitation of Your remedies (as provided above) is determined by a court to be unenforceable, Your sole remedy in the event of a pre-Settlement default by Us under (1) or (2) above shall be limited to the right to recover the greater of (A) the Deposit (to the extent previously paid to Us) together with accrued interest thereon at the legal rate or (B) actual damages You have suffered as a result of Our pre-Settlement default (as hereafter defined), in return for which You and We shall be automatically deemed released from this Agreement and the Property. The term "actual damages" shall mean the difference between the fair market value of the Property on the date We default and the Purchase Price. TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW, YOU EXPRESSLY WAIVE THE RIGHT TO SUE FOR SPECIFIC PERFORMANCE OF THIS AGREEMENT AS WELL AS ANY CLAIMED RIGHT TO ASSERT OR FILE A LIS PENDENS AGAINST THE PROPERTY AND FURTHER COVENANT NOT TO DO EITHER UNDER ANY CIRCUMSTANCES. You agree that the liquidated damages provision set forth above is sufficient consideration for Your waiver of the right to sue for specific performance. All of Your rights to sue Us for default or breach of this Agreement shall merge with the deed and Your sole and exclusive remedy for any post-Settlement default by Us under the portions of this Agreement that survive Settlement shall be limited to the lesser of (i) the cost to perform or (ii) the diminution in the Property value caused by any such default, and Our alleged default in performance shall be judged exclusively by the written performance standards defined in the Limited Warranty. You hereby waive and release all other remedies following Settlement.

14. **Claims and Disputes.** You and We agree that any and all claims arising out of or relating to this Agreement, Settlement hereunder, or improvements to the Property, regardless of legal theory, except any claims under the Limited Warranty ("Claims"), shall be subject to a one (1) year limitation of action period and bar date. Such claims based on matters occurring before the Settlement Date shall be deemed to have arisen and accrued, if at all, and the one year limitation of action period for all such claims shall begin to run on the Actual Settlement Date. All application of the so-called "discovery rule" is mutually waived by the parties. By executing this Agreement, You acknowledge Your understanding and agreement to these terms and that the said one (1) year period is completely reasonable in all respects. Notwithstanding the foregoing, these bar date terms shall not apply to claims for indemnity and/or contribution by Us against You and/or any other person. These rights may only be enforced by You and Us and nothing herein shall be construed to create any third party beneficiary rights in any other person or entity.

15. **Naturally Occurring Gases, Arsenic and Other Metals.** You agree that this Agreement is not conditioned upon testing results for naturally occurring gases, including radon, arsenic, or other elemental metals, or the presence or lack of such gases, arsenic or other elemental metals affecting the Property. Upon Settlement, You will be deemed to have accepted the Property as to the presence of these gases and/or arsenic and/or other elemental metals now or in the future and Seller shall be released from any and all claims related to or arising from the presence of any naturally occurring gases, arsenic or other elemental metals. Purchasers seeking further information should contact the U.S. Environmental Protection Agency or their state environmental protection office.

16. **Biological Impurities.** Modern building codes require that homes be constructed to slow the escape of warm air from the house during the cold months and cold air during the warmer months. These tight construction requirements could also prevent certain invisible contaminants and irritants from escaping the Home. These could include animal dander, dust, dust mites, fungi, mold, bacteria and pollen, which we will call "Biological Impurities". These can be brought into the Home through the natural circulation of air, carried into the Home by people, animals or things, including building materials and, once brought into the Home, have no way of escaping. Moisture in the Home, which can be caused by the level of air conditioning or heating and natural components used in the construction of Your Home, such as wood, can cause these Biological Impurities to grow. Homeowners can take measures to minimize Biological Impurities, which measures are more fully listed in the Limited Warranty provided to You at Settlement. We are not experts in identifying Biological Impurities or any possible effects which they can cause to You or Your family. Under the Limited Warranty, We are responsible for repairing or replacing any damage caused by a defect in materials or workmanship in the original construction (please read the Limited Warranty carefully as limitations and exclusions apply). We are not responsible for any Biological Impurities that are not caused by defects in the original construction of Your Home or which are caused or made worse through Your actions or inactions.

17. **Landscaping And Storm Water Management.** You will be responsible, at Your sole cost and expense, for fully landscaping the Lot in accordance with the Homeowners Association covenants and/or guidelines (if applicable) within three (3) months after Settlement or as soon as weather will permit. If any Homeowners Association restriction or covenant is more restrictive than this Paragraph 17, then the Homeowners Association restriction shall prevail. Prior to commencing construction of the Home, We will obtain for the Property coverage under the Ohio Environmental Protection Agency ("OEPA") NPDES Construction Storm Water General Permit ("Ohio CGP"). Once We have completed all soil disturbing activities on the Property and established through hydroseeding, or other method of Our choice, a uniform vegetative cover to meet the requirements of the OEPA CGP, We will submit to OEPA a notice of termination of coverage under the Ohio CGP ("NOT") for the Property. We make no representations or warranties about permits (including OEPA permits) which may be required for future improvements or changes to the Property.

18. **Oral Statements or Promises.** Unless oral statements or promises are written into this Agreement, they are not enforceable under law. By including the terms below, You and We are making them part of this Agreement and agree to abide by these terms. THIS SECTION SHOULD NOT BE LEFT BLANK IF YOU ARE RELYING ON ANY ORAL STATEMENTS OR PROMISES. The following oral statements or promises have been made in conjunction with this Agreement and performance of each of these statements or promises is incorporated into each party's obligation to fully perform the terms of this Agreement:
NONE

19. **Insulation.** The type, size and R value of insulation to be installed in your new Home shall be at least as shown on the chart below. R means resistance to heat flow; the higher the R value, the greater the insulation power.

| LOCATION | R-VALUE* | TYPE** |
|---|---|---|

| Slab · W/O basement or slab on grade, Only. CZ 4, 5 & 6 | R-10 | 2' V Rigid Foam |
|---|---|---|
| Conditioned Crawl space | R-10 | 2" Rigid Foam |
| Un - Conditioned Crawl space | R-19 | 5½" Fiberglass Batt |
| Unfinished Foundation Walls to unconditioned space | R-11 (4ft from top of foundation wall) | 3½" Fiberglass Batt |
| Finished Foundation Walls to unconditioned space | R-13 | 3½" Fiberglass Batt |
| Exterior Walls | R-13 | 3½" Fiberglass Batt |
| Floors above unconditioned space to include over garages and overhangs. | R-30 | 10" Fiberglass Batt |
| Attics (flat) | R-30 | 10.25" Blown Fiberglass |
| Attics (cathedral) | R-30 | 9.5" Fiberglass Batt |

*  This is a minimum rating; the R-value may be higher if required by local jurisdictions. The R-value as constructed will be available prior to the Actual Settlement Date.

**  Thickness of fiberglass insulation provided is based on U.S. Greenfiber, LLC Cocoon2 Stabilized Cellulose Insulation. Thickness may vary from manufacturer to manufacturer; however the R value will remain the same.

**20. Community/School Information.** We include certain information in Our marketing, advertising, promotional and sales documents regarding the community for informational purposes only and such information is given to the best of Our knowledge as of the date the information is given. We make no warranties as to the accuracy or timeliness of this information and You acknowledge that this information is subject to change, that You are not relying upon such information in entering into this Agreement and none of such information is a part of this Agreement. School district and boundary information may be obtained by contacting the appropriate County or City School Board.

**21. Successors and Assigns.** This Agreement shall be binding on the parties and their heirs, legal representatives and permitted assigns. You cannot assign this Agreement without Our prior written consent, which may be withheld at Our sole discretion.

**22. Risk of Loss.** We assume the risk of loss or damage to the Property by fire or other casualty until Settlement. If such loss or damage occurs, We may terminate this Agreement and refund the Deposit to You without further liability to You. In such event, You would have no right to or interest in fire or other casualty or hazard insurance proceeds.

**23. Time is of the Essence.** TIME IS OF THE ESSENCE FOR THIS AGREEMENT. This means that the failure to do what is required within the timeframes specified in this Agreement or, if no timeframe is given, within a reasonable period, is a default under the Agreement.

**24. Picture Release.** You give Us full permission to use, publish, and copyright photographic prints and any other reproductions of the Property, or any part thereof, for advertising, publicity, and for any and all bona fide commercial purposes whatsoever.

**25. Miscellaneous.** All notices and communications under this Agreement shall be in writing, except as otherwise provided herein, and shall be deemed duly given on the date such notice is (i) mailed by U.S. postal service regular mail or certified mail, first class postage prepaid, (ii) delivered to an overnight courier for next day delivery, (iii) sent by facsimile or electronic mail with transmission verification, or (iv) delivered by personal delivery. All communication to Seller shall be sent to the address provided at the beginning of this Agreement, and if to You to the address provided on the first page of this Agreement. The parties shall be responsible for notifying each other of any change of address. This Agreement (including any notices thereof) shall not be recorded. The invalidity of any provision of this Agreement shall not affect the validity or enforceability of any other provision set forth herein. Where the context requires, words in the singular shall be substituted for the plural and vice versa, and words in the masculine shall be substituted by any gender. This Agreement, its formation and enforceability shall be governed by the laws of the State of Ohio without regard for conflicts of law principles. Any rules of interpretation wherein this Agreement is construed against its drafter are waived.

**26. Entire Agreement.** This Agreement, together with the Ohio Addendum to Purchase Agreement, the Affiliated Business Arrangement Disclosure, and all other addenda pertaining thereto are incorporated by reference and constitute the entire and final Agreement. No other prior or contemporaneous agreements, representations, promises or terms (written or oral) are part of this Agreement, but are superseded by this written Agreement. No additions or changes to this Agreement shall be valid or binding unless signed by You and Our authorized officer.

**27. Sales and Marketing Representative Acknowledgment; Broker Commission.** The Sales Representative works for Us, which means that he or she may assist You in purchasing the property, but his or her duty of loyalty is only to Us. Additionally, You warrant to Us that this sale was brought about solely by Our sales personnel and that no outside broker or salesperson was the procuring cause of this sale, unless the box below is checked.

If either box below is checked, You have engaged the services of a realtor and broker. You agree to hold Us harmless and to defend Us against any claim for compensation of any kind made by any realtor or broker in connection with this Agreement except for the realtor and broker identified below. We agree to pay Broker a commission in the amount of either:

☒ Flat Dollar Amount of $ 1,500.00 ; or

☐ _____% of_____ of $_____

The commission is payable upon disbursement of funds at Settlement. Any commission due to Broker shall not be deemed earned until Settlement and We will pay the commission to the Broker from the Settlement proceeds.

Broker Name and Address: eXp Realty  
159 Crocker Park Blvd Ste 400 , Westlake , OH 44145  
Realtor Name and Address: Austin Bates  
159 Crocker Park Blvd Ste 400 , Westlake , OH 44145  

OHMASTERSALEAGT. 112221  
Print Date: 9/18/2022

Page 6 of 10

28. Merger. Except as specifically provided in this Agreement, all of Your rights and remedies under the Agreement shall merge with (and shall be completely extinguished and superseded by) the deed delivered to You at Settlement. The sole and only exceptions to that intended and agreed merger are those rights and remedies (if any) which are expressly defined in (a) the deed, and (b) the Limited Warranty to be issued to You at Settlement. You hereby voluntarily and expressly waive and release all contrary claims and entitlements. You agree to execute any documentation reasonably required at Settlement to further memorialize the intent of the parties stated in this Paragraph 28 and that Your rights and remedies post-Settlement shall be limited to items (a) and (b) herein. Unless otherwise expressly stated in the Agreement, all of Your obligations under the Agreement and all of the Our rights and remedies under the Agreement, including but not limited to, Paragraphs 1, 6, 7, 9(c)-(e), 11, 12(b), 13(b), 14-20, 24-28 as well as all Addenda, shall survive and shall not be merged into the deed delivered at Settlement.

29. THIS IS A LEGALLY BINDING CONTRACT. READ AND UNDERSTAND ALL PROVISIONS PRIOR TO SIGNING. IF YOU DO NOT UNDERSTAND, SEEK LEGAL OR OTHER COMPETENT ADVICE. IF YOU SIGN BELOW, IT SHALL BE CONCLUSIVELY PRESUMED THAT YOU HAVE FULLY READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT. YOU ACKNOWLEDGE THAT THIS AGREEMENT, AS SIGNED BY YOU ALONE, CONSTITUTES AN OFFER TO PURCHASE AND THAT THIS AGREEMENT SHALL NOT BE BINDING UPON US UNTIL EXECUTED BY ONE OF OUR VICE PRESIDENTS. THE SALESPERSON OR REPRESENTATIVE RECOMMENDING APPROVAL IS NOT SUCH A VICE PRESIDENT. YOUR OFFER SHALL BE REVOCABLE ONLY BY WRITTEN NOTICE OF REVOCATION GIVEN TO AND RECEIVED BY OUR APPLICABLE VICE PRESIDENT PRIOR TO OUR ACCEPTANCE. WE ARE NOT REQUIRED TO PROVIDE NOTICE OF OUR ACCEPTANCE TO YOU AND ACCEPTANCE OCCURS UPON SIGNATURE BY OUR VICE PRESIDENT.

PURCHASER: *Blake Kudra*

Date: 9/18/2022

*Haley Green*

Date: 9/18/2022

SELLER:

NVR, INC. t/a __Ryan Homes__

Date:_____  By:_____
                                                      Vice President



FIRST-CLASS





US POSTAGE ™ PITNEY BOWES

ZIP 44702 $ 010.29⁰
02 7W
0008033659 MAY 29. 2026.



JS 44  (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Blake Kedra and Haley Kedra

3519 Yellow Creek Ave. NW, Massillon, Ohio 44647

**(b)** County of Residence of First Listed Plaintiff    **Stark County**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Michael R. Fortney, Fortney Law, LLC

300 Weatherstone Dr. #303

## DEFENDANTS

NVR Inc.

6770 West Snowville Road, Suite 200, Brecksville, Ohio
County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

David D. Yeagley and Ryan W. Gillespie

UB Greensfelder LLP

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine / ☐ 368 Asbestos Personal Injury Product | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability / Liability | | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice / ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | / ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | / ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | / ☐ 555 Prison Condition | | | |
| | / ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened |
| ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332

Brief description of cause:
Homeowner action against builder for breach of contract, violations of HCSAA, fraud, and declaratory judgment.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
$294,150+

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____  DOCKET NUMBER _____

DATE
June 22, 2026

SIGNATURE OF ATTORNEY OF RECORD
/s/ Ryan W. Gillespie

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

**I.**  Civil Categories: (Please check one category only).

1. [✔] General Civil
2. [ ] Administrative Review/Social Security
3. [ ] Habeas Corpus Death Penalty

*If under Title 28, §2255, name the SENTENCING JUDGE: _____

CASE NUMBER: _____

**II.**  **RELATED OR REFILED CASES** See LR 3.1 which provides in pertinent part: "If an action is filed or removed to this Court and assigned to a District Judge after which it is discontinued, dismissed or remanded to a State court, and subsequently refiled, it shall be assigned to the same Judge who received the initial case assignment without regard for the place of holding court in which the case was refiled.  Counsel or a party without counsel shall be responsible for bringing such cases to the attention of the Court by responding to the questions included on the Civil Cover Sheet."

This action: [ ] is **RELATED** to another **PENDING** civil case [ ] is a **REFILED** case [ ] was **PREVIOUSLY REMANDED**

**If applicable, please indicate on page 1 in section VIII, the name of the Judge and case number.**

**III.**  In accordance with Local Civil Rule   3.8, actions involving counties in the Eastern Division shall be filed at any of  the divisional offices therein.  Actions involving counties in the Western Division shall be filed at the Toledo office. For the purpose of determining the proper division, and for statistical reasons, the following information is requested. ANSWER ONE PARAGRAPH ONLY. ANSWER PARAGRAPHS 1 THRU 3 IN ORDER.  UPON FINDING WHICH PARAGRAPH APPLIES TO YOUR CASE, ANSWER IT AND STOP.

(1)  **Resident defendant** . If the defendant resides in a county within this district, please set forth the name of such county
**COUNTY**:
Corporation **For the purpose of answering the above, a corporation is deemed to be a resident of that county in which it has its principal place of business in that district.**

(2)  **Non-Resident defendant**. If no defendant is a resident of a county in this district, please set forth the county wherein the cause of action arose or the event complained of occurred.
**COUNTY**:

(3)  **Other Cases.** If no defendant is a resident of this district, or if the defendant is a corporation not having a principle place of business within the district, and the cause of action arose or the event complained of occurred outside this district, please set forth the county of the plaintiff's residence.
**COUNTY**:  Stark County

**IV.**  The Counties in the Northern District of Ohio are divided into divisions as shown below.  After the county is determined in Section  III, please check the appropriate division.

**EASTERN DIVISION**

[✔] Akron - (Counties: Carroll, Holmes, Portage, Stark, Summit, Tuscarawas and Wayne)

[ ] Cleveland - (Counties: Ashland, Ashtabula, Crawford, Cuyahoga, Geauga, Lake, Lorain, Medina and Richland)

[ ] Youngstown - (Counties: Columbiana, Mahoning, and Trumbull)

**WESTERN DIVISION**

[ ] Toledo - (Counties: Allen, Auglaize, Defiance, Erie, Fulton, Hancock, Hardin, Henry,  Huron, Lucas, Marion, Mercer, Ottawa, Paulding, Putnam, Sandusky, Seneca VanWert, Williams, Wood and Wyandot)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**UNITED STATES POSTAL SERVICE.**

Date Produced: 06/15/2026

STARK COUNTY CLERK OF COURTS MAIL ROOM:

The following is the delivery information for Certified Mail™/RRE item number 9414 8149 0368 0975 3822 38. Our records indicate that this item was delivered on 06/08/2026 at 02:12 p.m. in COLUMBUS, OH 43216. The scanned image of the recipient information is provided below.

Signature of Recipient :

Signature X *Mulry Hatt*
Printed Name *Mckenzie Hartman*

Address of Recipient :

Delivery Address *1160 Dublin Road, Suite*

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Customer Reference Number:          2026CV01136

STARK COUNTY COMMON PLEAS COURT
CIVIL DESIGNATION FORM
**PURSUANT TO LOCAL RULE 9.02, THIS FORM MUST BE FILLED OUT IN ITS ENTIRETY.
IF THIS FORM IS NOT FILLED OUT IN ITS ENTIRETY, THE COMPLAINT AND ALL
OTHER DOCUMENTS WILL BE RETURNED BY THE CLERK WITHOUT FILING.**

CASE NUMBER _____ 2 0 2 6 C V 0 1 1 3 6

PLAINTIFF   Blake Kedra, et al.

-vs-                                        *Haupt*

DEFENDANT   NVR, Inc.

Has this case been previously filed and dismissed? ____Yes __X__No. If yes, list case no. and
judge._____

List all related pending case(s) including case number and judge. _____

### CIVIL CATEGORIES: PLACE (X) IN ONE CATEGORY ONLY

{ } A. Professional Tort                          { } E. Foreclosure
    { } Medical Malpractice
    { } Dental Malpractice
    { } Optometric Malpractice                 { } F. Administrative Appeal
    { }Chiropractic Malpractice
    { } Legal Malpractice                      { } G. Complex Litigation Classification Requested
    { } Other Malpractice

{ } B. Product Liability
                                                 { } H. Other Civil
{ } C. Other Tort                                    {X} Contract Case
    { } Personal Injury                           { } Miscellaneous Civil
    { } Personal Injury- Auto                     { } Real Property
    { } Miscellaneous                             { } Consumer Sales Practices Act
                                                     { } Credit Card Case
{ } D. Workers Compensation

**Brief Factual Summary:**

  NVR Breached contract related to new home build.

**Description of damages including all special damages to date:**

  To be determined, but in excess of $15,000

**Do you think this case should be referred to the Court Mediation Program at this time? __Yes_X_No
Reasons:**

**Is this case based on a violation of the Ohio Mortgage Broker Act (ORC 1322) ? ____ Yes __X__ No**

Fortney Law LLC_____      Michael R. Fortney (92325)_____
Firm Name (Print or Type)             Attorney of Record (Print or Type)

300 Weatherstone Dr. #303 Wadsworth, OH 442821  /s/Michael R. Fortney_____
Address                               Signature

330.619.8502_____      92325_____
Telephone                             Attorney Registration Number
REV. 9/09

LYNN A. TODARO
CLERK OF COURTS
STARK COUNTY, OHIO

2026 MAY 28  AM 10: 13

## IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

| | |
|---|---|
| BLAKE KEDRA<br>3519 Yellow Creek Ave. NW<br>Massillon, OH 44647<br><br>and<br><br>HALEY KEDRA<br>3519 Yellow Creek Ave. NW<br>Massillon, OH 44647<br><br>Plaintiffs,<br><br>vs.<br><br>NVR, INC.<br>c/o Corporation Service Company<br>1160 Dublin Road, Suite 400<br>Columbus, OH 43215<br><br>Defendant. | CASE NO. 2 0 2 6 C V 0 1 1 3 6<br><br>JUDGE        *Haupt*<br><br><br>**COMPLAINT** |

Plaintiffs Blake and Haley Kedra, through counsel, for their Complaint against Defendant NVR, Inc., allege the following:

### INTRODUCTORY STATEMENT

SCANNED

1.      Plaintiff Blake Kedra is an individual and a resident of the State of Ohio, presently residing at 3519 Yellow Creek Ave. NW, in Massillon, Ohio.

2.      Plaintiff Haley Kedra is an individual and a resident of the State of Ohio, presently residing at 3519 Yellow Creek Ave. NW, in Massillon, Ohio.

3.      Defendant NVR, Inc. is a corporation, organized and operating under the laws of the State of Virginia.

4.      This Court has jurisdiction over this case pursuant to R.C. § 2305.01 because the amount at issue exceeds $15,000.

5.      Venue is proper in this Court pursuant to Civ.R. 3(C) because the activities conducted by Defendant took place in Massillon, Ohio in Stark County.

## FACTS

6.      Plaintiffs Blake and Haley Kedra (together "Plaintiffs") entered into a contract with Defendant NVR, Inc. (NVR) on or around September 18, 2022 (the "Contract").

7.      A true copy of the Contract is attached to this Complaint as Exhibit 1.

8.      The Contract called for Plaintiffs to purchase a lot and new home built by NVR (the "Project") on the lot at 3519 Yellow Creek Ave. NW (the "Property").

9.      The Contract is a "home construction service contract" as that term is used in R.C. § 4722.01(C).

### NVR Misrepresentations Regarding Flood Plain

10.     Prior to execution of the Contract, Plaintiffs retained the services of Austin Bates of eXp Realty as their real estate agent to assist with Plaintiffs' purchase of the Property, as well as the Contract.

11.     Mr. Bates negotiated the purchase and Contract with NVR and NVR representatives.

12.     As part of the negotiations described in the preceding paragraph, Mr. Bates specifically asked NVR whether the Property located at 3519 Yellow Creek Ave. NW was in a flood zone.

2

13.    After the question in the preceding paragraph, NVR and its representatives responded to Mr. Bates that the Property located at 3519 Yellow Creek Ave. NW was not in a flood zone.

14.    Relying on this statement, Plaintiffs agreed to enter into the Contract with NVR.

15.    Subsequently, work commenced and the Project was completed in February of 2023.

16.    Plaintiffs closed on the Property on or around February 23, 2023.

17.    Plaintiffs used NVR or its title company for the closing.

18.    At closing, Mr. Bates and Plaintiffs again asked if the Property was in a flood zone, and again they were told it was not, and Plaintiffs did not receive any Standard Flood Zone Determination Form as part of the closing on the Property.

19.    Once again, after receiving assurances and representations from NVR that the Property was not in a flood zone, Plaintiffs closed on the Property.

20.    Unbeknownst to Plaintiffs, the Property was in a flood zone all along, specifically NFIP Map Number 39151C 0187E.

21.    The only reason that Plaintiffs were able to determine that their home is in a flood zone was due to refinancing the property, when the new lender disclosed the flood zone through a Standard Flood Zone Determination Form.

22.    The Property was in a flood zone since at least September 29, 2011.

23.    NVR was aware that the Property was in a flood zone prior to Plaintiffs purchasing the Property.

24.    NVR was aware of the Flood Disaster Protection Act prior to entering into the Contract.

3

25.     Pursuant to the Flood Disaster Prevention Act, NVR should have disclosed that Plaintiffs' home was in a flood zone prior to Plaintiffs purchasing the home.

26.     NVR and its representatives misrepresented the flood zone status of the Property prior to and during Plaintiffs' purchase of the Project and Property.

**Completion of Development and Development of Water Issues**

27.     The Project was completed in February of 2023, and Plaintiffs moved into their new home shortly afterward.

28.     At this time, Plaintiffs' home was the last home built in phase 2 of the development.

29.     After February of 2023, NVR continued to build homes in the development and in the area uphill from the Property.

30.     Specifically, phase 3 of the construction in the development involved NVR building additional homes on Yellow Creek Avenue to the east and north of the Property.

31.     This section of Yellow Creek Avenue rises uphill from the Property.

32.     Phase 3 of the development consisted of building 39 homes.

33.     Each of these homes was built at a higher elevation than Plaintiffs' Property.

34.     Phase 3 was completed on October 31, 2023.

35.     On or around April 3, 2024, Plaintiffs experienced flooding at the Property.

36.     The flooding described in the preceding paragraph caused water to intrude into Plaintiffs' home.

37.     The amount of rain on or around April 3, 2024 was ordinary.

38.     After the April 3, 2024 water intrusion event, Plaintiffs submitted a claim to NVR pursuant to the warranty provision contained in the Contract.

39.     NVR sent representatives to the Property to investigate on or around April 15, 2024.

4

40. On or around April 5, 2025, Plaintiffs again experienced flooding at the Property.

41. The flooding described in the preceding paragraph caused water to intrude into Plaintiffs' home.

42. After the April 5, 2025 water intrusion event, Plaintiffs submitted a claim to NVR pursuant to the warranty provision contained in the Contract.

43. The amount of rain on or around April 5, 2025 was ordinary.

44. The water intrusion potential has not been fixed or alleviated by NVR.

45. This is because there is no way to fix the issue, due to the elevation of Plaintiffs' home relative to the overflow height of the pond behind Plaintiffs' property.

46. In order to permanently alleviate the issues that Plaintiffs face, the entire house would need to be elevated three to four feet.

### Plaintiffs' Damages

47. Plaintiffs' main damages come from being misled into the purchase of the Property.

48. Had Plaintiffs known about the flood plain designation, something that Plaintiffs and their realtor asked about multiple times before the purchase was finalized, Plaintiffs would not have purchased the Project and Property.

49. Instead, Plaintiffs were misled into purchasing a Project that should not have been built on the lot to begin with.

50. As such, Plaintiffs' damages consist of the purchase price of the home, plus other costs associated with the home, including interest paid on Plaintiffs' loan.

51. Additionally, Plaintiffs seek punitive damages against NVR related to the misrepresentations.

**Objectionable Terms in Contract**

52.     Defendants intend to rely on clauses from Section 14 of the Contract, but those clauses are objectionable and unreasonable when applied to a home construction contract such as this.

53.     Section 14 contains a one-year limitation clause and bar date, which is unreasonable.

54.     For instance, the first flood did not occur inside of one year, so it is unreasonable to not allow Plaintiffs to seek damages for breach of contract.

55.     Additionally, the flood at Plaintiffs' home most likely occurred due to changes in the flow of water as a result of NVR building and completing Phase 3 and Phase 4 of the development after the spring of 2023.

56.     Additionally, the misrepresentations of NVR were not discovered within one year, so it is unreasonable to allow NVR to perpetuate misrepresentations with the ability to fall back on a clause like this if their misrepresentations are not discovered within one year.

## FIRST CLAIM: BREACH OF CONTRACT

57.     Plaintiffs restate and reallege each of the preceding paragraphs as if fully restated herein.

58.     Plaintiffs fully performed their obligations under the Contract.

59.     NVR breached the Contract by failing to complete the Project in a workmanlike manner.

60.     NVR breached the Contract by building a home with a basement on a lot in a flood zone.

6

61. NVR breached the Contract by designing a home with a basement on a lot in a flood zone.

62. NVR breached the Contract by building a home with a basement at a lower elevation than the overflow height of the retention pond behind Plaintiffs' home.

63. NVR breached the Contract by designing a home with a basement at a lower elevation than the overflow height of the retention pond behind Plaintiffs' home.

64. Plaintiffs have been damaged by NVR's breaches in an amount to be proven at trial, but believed to exceed $25,000.

**SECOND CLAIM: R.C. § 4722 (HOME CONSTRUCTION SERVICE SUPPLIERS ACT)**

65. Plaintiffs restate and reallege each of the preceding paragraphs as if fully restated herein.

66. Plaintiffs are each an "owner" as defined by R.C. § 4722.01(E).

67. NVR is a "supplier" as defined by R.C. § 4722.01(D).

68. The Contract is a "home construction service contract" as defined by R.C. § 4722.01(C).

69. NVR committed multiple violations of R.C. 4722.03.

70. NVR failed to perform the home construction service in a workmanlike manner, chiefly by building a home that fails to accomplish one of its chief purposes, being watertight.

71. The allegation contained in the preceding paragraph is a violation of R.C. 4722.03(A)(1)(d).

72. Section 6 of the Contract also contains a waiver of the implied warranties of workmanship and building in a workmanlike manner, meaning NVR made the performance of the home construction service contingent upon Plaintiffs waiving rights provided by R.C. 4722.

7

73.     The allegation contained in the preceding paragraph is a violation of R.C. 4722.03(A)(4).

74.     Pursuant to R.C. 4722.08(A), Plaintiffs are entitled to recover their actual economic damages, plus $5,000 in noneconomic damages for each violation of R.C. 4722.

75.     Further, pursuant to R.C. 4722.08(D)(2), since NVR committed the acts knowingly, Plaintiffs are entitled to an award of attorney fees.

76.     Plaintiffs have been damaged by Defendants and are entitled to recovery of their actual economic damages to be determined at trial, plus an award of at least $10,000 in non-economic damages, plus attorney's fees under the Home Construction Service Suppliers Act, R.C. § 4722.

### THIRD CLAIM: FRAUD

77.     Plaintiffs restate and reallege each of the preceding paragraphs as if fully restated herein.

78.     Prior to purchasing the home and the Property, Plaintiffs, through their representative, specifically asked NVR whether the Property was in a designated flood zone.

79.     NVR explicitly told Plaintiffs' representative that the Property was not in a flood zone.

80.     Only after learning that the Property was not in a flood zone did Plaintiffs agree to enter into the Contract.

81.     Prior to closing on the Property, Plaintiffs again asked NVR whether the home was in a flood zone, and again Plaintiffs were told, by different NVR representatives, that the Property was not in a flood zone.

82.     Based on those discussions, Plaintiffs felt comfortable closing on the Property.

8

83. Unbeknownst to Plaintiffs, the Property was in a flood zone all along, specifically NFIP Map Number 39151C 0187E, a designation existing since at least September 29, 2011.

84. The Contract was executed after September 29, 2011.

85. The questions from Plaintiffs representative regarding the flood zone designation happened after September 29, 2011.

86. NVR knew or should have known about the flood zone designation on the Property, specifically NFIP Map Number 39151C 0187E, since at least September 29, 2011.

87. NVR is a national home builder that closes on loans through its own title company, in addition to working with other title companies.

88. NVR is experienced with the Flood Disaster Protection Act.

89. NVR is experienced with the Standard Flood Zone Determination Form.

90. NVR's failure to provide Plaintiffs with a Standard Flood Zone Determination Form related to the Property was intentional, in order to alleviate Plaintiffs' concerns with the flood zone determination and ultimately cause Plaintiffs to enter into the Contract.

91. NVR committed an additional misrepresentation prior to closing when it again lied to Plaintiffs about the flood zone status of the Property.

92. NVR committed this misrepresentation in order to get Plaintiffs to close on the home and Property, which would cause NVR to directly receive a benefit, namely the purchase price of the Property.

93. These acts amount to fraud by NVR.

94. NVR is liable for fraud in an amount to be proven at trial, plus punitive damages in order to encourage NVR to act with truth and candor in the future.

9

## FOURTH CLAIM: DECLARATORY JUDGMENT

95.     Plaintiffs restate and reallege each of the preceding paragraphs as if fully restated herein.

96.     The "one (1) year limitation of action period and bar date" contained in Section 14 of the Contract is unreasonable, particularly in the context of construction, including residential home construction, and particularly when applied to misrepresentations and fraud that, if undiscovered for over one year, such as in this case, allows NVR to commit fraudulent acts without fear of litigation.

97.     As such, Plaintiffs request a judgment declaring this provision to be unreasonable, unlawful, and against the public policy of the State of Ohio.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Blake and Haley Kedra pray for the following relief:

(1)     As to the First Claim, a judgment declaring that Defendant NVR, Inc. breached the Contract, and finding Plaintiffs have been damaged by said breach in an amount to be proven at trial.

(2)     As to the Second Claim, a judgment declaring that Defendant NVR, Inc. violated Ohio's Home Construction Service Suppliers Act and, pursuant to R.C. § 4722.01, et seq., awarding Plaintiffs their actual economic damages to be proven at trial, plus at least $10,000 in noneconomic damages, plus the attorney's fees and costs incurred by Plaintiffs in prosecuting this action, to be decided at a subsequent hearing.

(3)     As to the Third Claim, a judgment declaring that Defendant NVR, Inc. committed fraud and awarding Plaintiffs punitive damages in a sufficient amount to deter NVR from committing fraud in the future, plus Plaintiffs' reasonable attorney fees.

10

(4)　　As to the Fourth Claim, a declaratory judgment that the one year limitation of action period and bar date contained in Section 14 of the Contract is unreasonable and unlawful.

(5)　　Pre- and post-judgment interest at the statutory rate.

(6)　　Such other relief as the Court deems just and proper under the circumstances.

Respectfully submitted,


/s/Michael R. Fortney
Michael R. Fortney (#0092325)
FORTNEY LAW, LLC
300 Weatherstone Dr. #303
Wadsworth, OH 44281
(330) 619-8502
mike@ohiolienlawyer.com

Attorney for Plaintiffs

11

| Lot __1031__ Block _____ | **[EXHIBIT]** **1** | Community __Kenyon Creek__ |
|---|---|---|

Lot __1031__ Block _____
Date of Purchase Agreement __09/18/22__
MASSILLON, OH 44647

Community __Kenyon Creek__
Property Address __3519 YELLOW CREEK AVE NW__

# OHIO PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (the "Agreement") is made as of the __18__ day of __September__, 20 __22__, by and between NVR, INC. t/a __Ryan Homes__, a Virginia corporation ("Seller", "Us", "Our" or "We") and __Blake Kedra__ (purchaser) and __Haley Green__ (co-purchaser), presently residing at __3055 Dewalt Dr Akron,OH 44312__ (telephone) __(330) 808-3676__ (individually and collectively "Purchaser", "You" or "Your"). Our address and telephone number is __6770 W Snowville Rd, Ste 100, Brecksville, OH 44141, 440-584-4200__. Our tax identification number is __54-1394360__.

1. **What You are buying.** The Property You are buying is:

Lot # __00001031__, Section # _____, Block # _____, Subdivision __Kenyon Creek__ (the "Community"), County or City of __STARK__, State of Ohio (the "Lot"), together with a home to be built on the Lot by Seller according to Seller's plan known as the __BIRCH__ Model, Set/Version # __BRH00-01__, including those options you have selected on the attached Master Selection Sheet. We will call this the "Home" and, with the Lot, the "Property" throughout this Agreement.

The Home may not be exactly like any of the model homes You may have seen. Also, the Home may be different than what You have seen in our advertisements and marketing information. The Home will be constructed as shown on the construction drawings (or blueprints), the grading plan, the record plat of subdivision, floor plans and other plans related to the construction of the Home, all of which You acknowledge that You reviewed, together with the options You selected on the Master Selection Sheet, which is incorporated into this Agreement by reference, and any Change Orders we mutually agree to during the time Change Orders are allowed to be submitted as provided in the Change Order Policy provided below. All of these together are called the "Plans and Specifications". You should also note that there are many ways to measure square footage so the final square footage of the Home may be different than that which is initially shown to You due to the method of measurement.

We offer You a wide variety of options to personalize Your Home to meet Your individual needs and requirements. Many of the components needed to construct the Home must be ordered well before construction begins and any changes after the date of this Agreement could affect the start of construction, loan approval process and closing of Your Home. In addition, many changes requested after the date of this Agreement require additional administrative, engineering, permit and loan approval actions, which may make the changes not only cost prohibitive, but can cause significant time delay.

All change requests are subject to Our approval. We are under no obligation to accept any change request beyond these change periods. We firmly adhere to this policy in order to best serve You and deliver the Home without delays.

The following is Our "Change Order Policy". Structural option change requests will be accepted within __10__ days after Your execution of this Agreement. All Change Order Addenda must be signed by You (if more than one Purchaser, all Purchasers must sign) and submitted to Your Sales Representative within this __10__ day time period or the change request will not be accepted or processed.

Non-structural option selections and/or change requests will be accepted as described below. All Change Order Addenda must be signed by the Purchaser (if more than one Purchaser, all Purchasers must sign) and submitted to Your Sales Representative within this time period or the change request will not be accepted or processed.

The final date that requests for flooring changes will be accepted is on or before: _____ __10/09/2022__.
The final date that requests for wiring changes will be accepted is on or before: _____ __10/09/2022__.
The final date that requests for all other non-structural changes will be accepted is on or before: _____ __10/09/2022__.
☐ If the box to the left is checked, no changes will be allowed for this Property.

PURSUANT TO O.R.C. SEC. 4722.01, IF AT ANY TIME A HOME CONSTRUCTION SERVICE REQUIRES EXTRA COSTS ABOVE THE COST SPECIFIED OR ESTIMATED IN THE CONTRACT THAT WERE REASONABLY UNFORESEEN, BUT NECESSARY, AND THE TOTAL OF ALL EXTRA COSTS TO DATE EXCEEDS FIVE THOUSAND DOLLARS OVER THE COURSE OF THE ENTIRE HOME CONSTRUCTION CONTRACT, YOU HAVE A RIGHT TO AN ESTIMATE OF THOSE EXCESS COSTS BEFORE THE HOME CONSTRUCTION SERVICE SUPPLIER BEGINS WORK RELATED TO THOSE COSTS. INITIAL YOUR CHOICE OF THE TYPE OF ESTIMATE YOU REQUIRE:

_Bk_ _HG_ Written Estimate     _Bk_ _HG_ Oral Estimate

We make no representations or warranties about what other improvements may be constructed within the Community including home types, sizes, location or prices or the uses of property adjacent to the Property or to the Community. Any plans or information You may have seen for this Community are subject to change. Unless otherwise stated in an addendum to this Agreement, We have no obligation to provide You with copies of the preliminary or final site plans, the record plat, blueprints, general plan maps or other planning documents which may affect the planning and development of the surrounding area. Also, utility transformers are the sole responsibility of the utility companies and we have no authority to determine where utility transformers may be located on the Property or anywhere in the Community.

You acknowledge that the timing of construction, location, existence, size and features of tot lots, trails, community entry features and monuments, and recreational facilities within the Community (collectively the "Facilities"), if any, are subject to change. No representations as to the timing, location, size or features of such Facilities are part of this Agreement.

You are purchasing the Property as [CHECK BOX A, B, C OR D BELOW]:

☒ A. Your principal residence and will occupy and reside in the Property.

OHMASTERSALEAGT. 112221
Print Date: 9/18/2022

Page 1 of 10

☐   B.    a model home pursuant to the attached Model Home Addendum.

☐   C.    a second home.

☐   D.    an investor. The Property will <u>not</u> be Your principal residence and You will not occupy and reside in the Property. You are not acquiring the Property as a second home. If this box is checked, Paragraph 4 does not apply to You.

You hereby represent and warrant to Us the truth and accuracy of the statements made above and You understand and agree that We are relying on the truth and accuracy of these statements as a material inducement to Our entering into this Agreement with You. If Your statements made above are found to be untrue or inaccurate, or if Your status changes prior to Settlement, You will be deemed to have checked the box above that truly and accurately reflects the circumstances involving Your purchase of the Property. In such event, We may require You to increase the Deposit, at Our discretion. Under such circumstances, You would be required to pay such Deposit increase to Us within ten (10) days after Our request for such additional Deposit is made. Your failure to fund any such increase of the Deposit shall be deemed to be a material breach of the Agreement.

   2.  **Sales Price and Payments.** You agree to pay to Seller for the Property, including the options listed on the Master Selection Sheet, the sum of $_____**294,150.00**_____ (the "Purchase Price") payable as follows:

    (a) Cash earnest money deposit upon Purchaser's signing of this Agreement............................ **$250.00**_____

    (b) An additional payment in cash due on or before ___**11/17/2022**___ .................................. **$4,750.00**_____

    (c) The balance in immediately available funds to be electronically transferred to the agent conducting the Settlement on the Actual Settlement Date hereunder...........................................................................................................

    **$289,150.00**_____

The term "Deposit" shall mean all amounts due from Purchaser to Seller pursuant to Paragraphs 2(a) and 2(b). Any checks accepted by Seller shall be subject to collection and payment. All refunds or credits to Purchaser of the Deposit shall be without interest, except as provided in Paragraph 13(b).

   3.  **Payment of Closing Costs and Cash Discount.** You are responsible for payment of all "Closing Costs" unless You are otherwise eligible for the Cash Discount as defined by this Paragraph and as permitted by applicable law.

"Closing Costs" are the fees and charges charged by Your lender and third parties related to the purchase and finance of your Home. Closing Costs include all charges due to Your lender, home insurance premiums, mortgage insurance premiums, title insurance premiums, Your attorney's fees, realtor commissions (unless We have agreed to pay these for You), all recordation fees and taxes (even if typically paid by a seller or grantor), and any other fees charged for the Settlement.

A Cash Discount is a credit applied toward the payment of Closing Costs. The Cash Discount cannot exceed the amount of Closing Costs due.

**You have the right to obtain a loan from any lender You choose.**

We have an affiliation with NVR Mortgage Finance, Inc. ("NVRM"). If You obtain Your mortgage loan through NVRM, You will be entitled to a Cash Discount of $**5,800.00**_____ at Settlement.

**If You select a lender other than NVRM, You are not eligible to receive the Cash Discount.**

**If You select NVRM as Your lender You are eligible for the Cash Discount.**

   4.  **How You intend to pay the Purchase Price.** ☐ If the box to the left is checked, You are paying the Purchase Price in cash (i.e., no mortgage loan) in which case this Paragraph does not apply to You.

If the box above is not checked, You intend to apply for a mortgage loan to pay the Purchase Price at Settlement, less any amounts (such as the Deposit) that You pre-pay. In order for us to complete Your Home by the Estimated Settlement Date (which is given in Paragraph 9(a)), You are required to apply for a mortgage loan with a lender of Your choice within seven (7) days after You sign this Agreement. You are also required to diligently work with Your lender in good faith to obtain loan approval, which we will refer to in this Agreement as the "Loan Approval". While We will assist You in working with Your chosen lender, it is Your responsibility to respond to Your lender's request for information and meet all the conditions of Your loan application and the Loan Approval and to keep us informed of the status of Your application. You authorize Us to communicate with Your chosen lender and to disclose information regarding this transaction to the lender.

If You do not have Loan Approval within forty-five (45) days after the date of this Agreement (the "Loan Approval Period"), We will have the right to cancel this Agreement. If we believe You have not used good faith efforts to obtain Loan Approval, We will have the right to keep Your Deposit. If You did not obtain Loan Approval in spite of using Your good faith efforts to do so, then we will refund Your Deposit once You sign Our Mutual Release Agreement. Alternatively, We could decide to extend the Loan Approval Period. However, if We determine that You are not using good faith efforts to obtain Loan Approval during the extended Loan Approval Period, We would have the right to terminate the Agreement and keep Your Deposit.

Once You obtain Loan Approval, it is Your responsibility to meet all of the conditions required by Your lender in order for You to complete Settlement on the Actual Settlement Date (as shown in Paragraph 9(a)). Once We issue the Settlement Notice defined in Paragraph 9(a), no changes to the Loan Approval will be allowed. If the Loan Approval is terminated by the lender due to circumstances beyond your control, and You are unable to obtain another Loan Approval prior to the Actual Settlement Date, We will terminate this Agreement and refund the Deposit to You after You sign Our Mutual Release Agreement.

Notwithstanding any other provisions of this Agreement, We may at any time prior to Settlement make a good faith determination that Your lender will not be able to timely approve and fund Your Loan or that the conditions established by Your lender are unlikely to be satisfied timely. In that event We may terminate this Agreement and refund to You Your Deposit (once you execute Our Mutual Release Agreement) and this Agreement would be without further force and effect.

OHMASTERSALEAGT. 112221
Print Date: 9/18/2022

Page 2 of 10

We will provide a Mortgage Location survey (in compliance with the standards set forth in Ohio Administrative Code Section 4733-38, as amended) at Your expense if required by Your lender, however, such survey will not include the staking of the Lot boundaries unless otherwise provided by an addendum to this Agreement.

**5.  No Contingencies.**  Unless otherwise provided by addendum attached hereto, this Agreement in no way is contingent upon the sale, rental, settlement or other disposition of any other property You own.

**6.  Limited Warranty.** You have received a copy of Seller's limited warranty ("Limited Warranty") prior to execution of this Agreement and you agree to accept the Limited Warranty as the sole warranty being given to You. The Limited Warranty is also available at http://myryanhome.com/Warranty.aspx. **THE LIMITED WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF FREEDOM FROM STRUCTURAL DEFECTS, WORKMANSHIP, WORKMANLIKE CONSTRUCTION, MERCHANTABILITY AND HABITABILITY, ALL OF WHICH PURCHASER HEREBY WAIVES.**

**7.  Right to Cure.**  OHIO LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT OR COMMENCE ARBITRATION PROCEEDINGS FOR DEFECTIVE CONSTRUCTION AGAINST THE RESIDENTIAL CONTRACTOR WHO CONSTRUCTED YOUR HOME.  AT LEAST SIXTY DAYS BEFORE YOU FILE A LAWSUIT OR COMMENCE ARBITRATION PROCEEDINGS, YOU MUST PROVIDE THE CONTRACTOR WITH A WRITTEN NOTICE OF THE CONDITIONS YOU ALLEGE ARE DEFECTIVE.  UNDER CHAPTER 1312 OF THE OHIO REVISED CODE, THE CONTRACTOR HAS AN OPPORTUNITY TO OFFER TO REPAIR OR PAY FOR THE DEFECTS.  YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER THE CONTRACTOR MAKES.  THERE ARE STRICT DEADLINES AND PROCEDURES UNDER STATE LAW, AND FAILURE TO FOLLOW THEM MAY AFFECT YOUR ABILITY TO FILE A LAWSUIT OR COMMENCE ARBITRATION PROCEEDINGS.

**8.  Preconditions to Construction.**  We are not required to start construction on the Home until We receive all of the following:
(a) All cash payments as required in Paragraph 2 above within the time provided;
(b) A written Loan Approval as required within the time period indicated in Paragraph 4 above (unless Paragraph 4 does not apply to You in which case, Loan Approval is not a precondition to construction);
(c) Your selection of all options; and
(d) All necessary governmental approvals and permits.
In the event We elect to commence construction prior to the receipt of (a), (b) or (c) above, You would still be obligated to complete those items.

**9.  Completion of Construction; Settlement and Delivery.**
(a) Construction is estimated to commence on or about __12/01/2022__ and be completed on or about __02/01/23__ at which time settlement on the Property ("Settlement") shall occur (the "Estimated Settlement Date"). However, there are many variables which must be taken in consideration when scheduling Settlement, many of which We have no control over, such as Your Loan Approval, issuance of permits and the weather.  Settlement will be scheduled by Us and We will give You no less than ten (10) days written notice (the "Settlement Notice") of the actual date of Settlement.  We will call this the "Actual Settlement Date". At the time of Settlement, You will receive the keys You will be able to move into Your new Home.  If there is a need to reschedule Settlement after issuance of the Settlement Notice, then any notice as to the rescheduled date and time will be provided to You no later than two (2) days prior to the Actual Settlement Date.  If You do not complete Settlement on the Actual Settlement Date, then You will be in default of this Agreement and We would have the rights and remedies outlined in Paragraph 13(a) against You.

We are required to complete Settlement on Your Home within two (2) years after the date of this Agreement.  If we do not complete Settlement within two (2) years, then you have the rights and remedies against us outlined in Paragraph 13(b).  However, if Settlement is not completed by that deadline due to Your breach or default under this Agreement, or some other reason not of Our control (see Paragraph 9(b) for a list of such reasons), then Settlement could be extended beyond the two years and We would not be in default.

If, prior to Settlement, We believe that You are no longer willing to complete Settlement, We may ask You to provide a written statement saying that You will complete Settlement.  If You do not provide such a statement, or if You otherwise give Us notice that you do not intend to complete Settlement, then You would be in default of this Agreement and We would have certain rights and remedies against You as outlined in Paragraph 13(a).

(b) There may be delays in construction or Settlement from causes beyond Our control, including, without limitation, acts or defaults by You; labor disputes of any kind; inability to procure materials or unusual delay in deliveries; delays or actions caused by government authority; government refusal to issue any necessary permits; delays caused by utility service providers; war, acts of terrorism, civil commotion or other casualty; damage caused by fire, earthquake, flood, hurricane or severe weather; disruptions resulting from a health crisis, such as an epidemic or pandemic; or any form of act of God.  If We are delayed, hindered or adversely affected by any of the foregoing events or any other events of a similar nature, whether or not the underlying event is foreseeable at the time of execution of this Agreement, the time for complete performance of this Agreement by Us (to satisfy the Interstate Land Sales Full Disclosure Act ("ILSA")) and for Settlement shall be extended for a period of time equal to the length of the delay attributable to such cause, and We would not be liable for damages for any such delay or failure to perform.

(c) You agree to complete Settlement when the Property is Substantially Complete. Substantially Complete shall be defined as the issuance by the local jurisdiction of a temporary or conditional certificate of occupancy or other document permitting residential use (the "Residential Use Permit") even if some items such as landscaping, driveways, final grading, exterior painting, and other minor punch-list items may not be completed. We will complete any such uncompleted items as soon as practicable, weather conditions permitting. In order to do so, We reserve the right to enter onto the Property after Settlement to complete such exterior items without Your prior approval.

(d) You have the right to schedule a private home inspection ("Inspection") of the Property by an independent home inspector at Your expense. However, the results of the Inspection must be received by Us no later than three (3) business days prior to the scheduled Settlement date. The Inspection must be performed by a full member in good standing of a national home inspection association in accordance with the ethical standards and code of conduct or practice of that association. Any home inspector must have insurance coverage acceptable to Us prior to entering the Property. You unconditionally indemnify and hold Us harmless from any

injury to person or property occurring as a result of the Inspection. If You elect to hire an independent private home inspector, We will reasonably cooperate in scheduling an Inspection; however, the Inspection must be scheduled with no less than 48 hours advance notice to Us and the Inspection must take place during normal construction working hours. The Inspection must be coordinated with Us and may not interfere with construction or delay the construction schedule. Any deficiencies identified by the Inspection shall be promptly submitted to Us in writing along with a certified report of the home inspector. In the event any deficiency identified by the Inspection is considered by Us to be a violation of any local codes or acceptable construction practices as defined in the Limited Warranty, We will correct such deficiency in a timely manner and the correction of any such deficiency shall not delay Settlement unless the deficiency is of such a nature as to make the Property uninhabitable.

(e) We will have the right to enter upon the Property at any time after Settlement for the purpose of making exterior changes to the Property, including but not limited to grading and drainage system changes and the removal or planting of trees.

(f) If We encounter any unusual or difficult ground conditions on the Lot, We may offer You one or more or the following options: (i) choosing an alternative lot from among those We are offering in the Community, if one is available or (ii) signing a Mutual Release Agreement and receiving a refund of the Deposit You have previously paid, thereby terminating this Agreement.

(g) Except as set forth in subsection (d) of this Paragraph 9, You may not have access or entry to the Property or the construction site during construction, nor may You store any possessions on the Property or the construction site prior to Settlement. Any violation of this provision may, at Our election, be considered a default of this Agreement and, in addition to any other remedies available to Us, We may terminate this Agreement and keep Your Deposit as fixed and liquidated damages. If You violate this provision, You will be deemed to be trespassing and We assume no liability or responsibility for any injuries suffered by You while on the Property or construction site, and You indemnify Us from any and all injury, cost, loss or damage arising from Your actions.

**10. Our Changes.**

(a) We have the right to substitute similar materials of substantially equivalent quality.

(b) We reserve the right to make changes in the Plans and Specifications for purposes of mechanical installations, building code and site requirements, and reasonable architectural design improvements subsequent to the date of this Agreement.

(c) We will determine, at Our discretion, the location and ground elevation of the Home and the necessity, if any, to reverse the plan of the Home to conform to the existing contours of the land.

**11. Payment of Taxes and Utility Charges.** All taxes and utility charges, including, without limitation, sewer and water benefit charges and other public dues, taxes and charges will be adjusted to the Actual Settlement Date based upon the most recent tax bill and You will thereafter assume responsibility for such charges. If no split figures are available, no proration shall be made. You will assume and be solely responsible for payment of all taxes and assessments that are not yet due and payable as of the Actual Settlement Date and We will not provide any reimbursement or credit for any such taxes or assessments. It is also Your responsibility to have all utility services to the Property transferred into Your name effective no later than the Actual Settlement Date. No funds shall be escrowed at Settlement for utility charges.

Local jurisdictions typically assess residential property owners for the cost of public improvements such as roads, water and sewer. Many times, the information regarding the assessments is not known until after the improvements are constructed and the local jurisdiction has a certification from the engineer and contractors of the total costs expended on the improvements. This amount is then assessed against all of the homeowners who benefit from the improvements. These assessments are typically included as part of the property tax bill. Since these improvements, from planning through to completion, typically take years, additional houses which benefit from the improvements may be approved and/or built, or, alternatively, some planned projects may never come to fruition. This would affect the amount of the assessment since it is based upon the number of properties benefiting from the improvements. We make no representations or warranties regarding any assessments which may affect the Property, either now or in the future.

**12. Title.**

(a) At Settlement, title to the Property shall be conveyed by Limited Warranty Deed and shall be good and marketable, fully insurable by a reputable American Land Title Association (ALTA) title insurance company subject, however, to (i) easements, covenants, conditions and restrictions of record, (ii) any statutory lien for ad valorem taxes which are not yet levied, published, due or payable, (iii) any homeowner's association documents restricting the use and enjoyment of the Property, (iv) zoning and other applicable laws and regulations, and (v) such facts as an accurate survey and personal inspection of the Property would reflect, provided same do not render title uninsurable or unmarketable. The Property is not subject to any ground rent. If title cannot be delivered at Settlement in compliance with this Paragraph, We may determine that we will remedy such title defects prior to Settlement at Our sole expense, in which case the time herein specified for Settlement will be extended for the period of time necessary for such action. However, if We cannot perfect title or are unable to perfect title after taking reasonable legal actions, We will promptly notify You in writing and You will have the right, at Your option, to either (i) terminate this Agreement by sending Us written notice of Your decision within ten (10) days after Your receipt of Our notice, or (ii) You can waive any title defects and proceed to Settlement. At the time Settlement occurs, You will be deemed to have accepted title and We will be expressly released from all liability or damages by reason of any defect in or failure of title. If You terminate the Agreement for title defects, We will refund the Deposit to You once You execute Our Mutual Release Agreement.

(b) If easements are required after Settlement, You agree to cooperate with Us, for no additional consideration (monetary or otherwise) in executing and delivering any and all documents related to such easements.

(c) You are purchasing a completed home from Us and We are not acting as a contractor for You in the construction of the Home. You acquire no right, title or interest in the Property or the Home by virtue of this Agreement except the right and obligation to purchase the completed Home and Lot in accordance with the terms of this Agreement. Equitable title shall remain vested in Us until delivery of the deed at Settlement.

**13. Default.**

(a) **Default-Purchaser.** If You fail to make full and timely Settlement or if You otherwise breach any provision under this Agreement, the damages that We will or may suffer as a result of Your breach or default are uncertain and not reasonably calculable with certainty. Accordingly, We reserve the right to retain the Deposit as liquidated damages and not as a penalty, in which event You and We will be relieved from further liability hereunder. In the alternative, We may retain the Deposit for the payment of damages and pursue such legal and/or equitable remedies We may have on account of Your breach or default, including, but not limited to, specific performance. In the event You fail to take title to the Property on the Actual Settlement Date as required in this Agreement, We may, in Our sole discretion, agree to extend the time of Settlement. In the event You do not settle on the Actual Settlement Date, regardless of whether or not We agreed to extend the time of Settlement, You will be responsible for payment of a late settlement charge computed at the rate of 1% of the unpaid balance of the Purchase Price per month beginning on the originally scheduled Settlement Date through the rescheduled Actual Settlement Date. No interest rate charged herein shall be in excess of that permitted

OHMASTERSALEAGT. 112221                                                                                                              Page 4 of 10
**Print Date: 9/18/2022**

by law. If there are multiple purchasers, each of You shall be jointly and severally liable hereunder. In the event that You are in breach or default under this Agreement, You will be responsible for reasonable attorneys' fees We incur in enforcing this Agreement.

(b) **Default-Seller.** We will be deemed to be in default upon Our failure (1) to complete Settlement as required hereunder; or (2) to perform the obligations required to be performed by Us hereunder prior to Settlement, unless You are in default. Your sole and exclusive remedy if We default shall be to recover Your Deposit (as defined in Paragraph 2 and to the extent previously paid to Us) plus interest on Your Deposit at the legal rate since the date of Our breach or default, plus the sum of One Thousand Dollars ($1,000.00) as liquidated damages and not a penalty (which sum is a reasonable estimate of actual damages which cannot be forecasted with certainty), in return for which You and We shall be automatically released from this Agreement and You would have no further rights to the Property. If the limitation of Your remedies (as provided above) is determined by a court to be unenforceable, Your sole remedy in the event of a pre-Settlement default by Us under (1) or (2) above shall be limited to the right to recover the greater of (A) the Deposit (to the extent previously paid to Us) together with accrued interest thereon at the legal rate or (B) actual damages You have suffered as a result of Our pre-Settlement default (as hereafter defined), in return for which You and We shall be automatically deemed released from this Agreement and the Property. The term "actual damages" shall mean the difference between the fair market value of the Property on the date We default and the Purchase Price. TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW, YOU EXPRESSLY WAIVE THE RIGHT TO SUE FOR SPECIFIC PERFORMANCE OF THIS AGREEMENT AS WELL AS ANY CLAIMED RIGHT TO ASSERT OR FILE A LIS PENDENS AGAINST THE PROPERTY AND FURTHER COVENANT NOT TO DO EITHER UNDER ANY CIRCUMSTANCES. You agree that the liquidated damages provision set forth above is sufficient consideration for Your waiver of the right to sue for specific performance. All of Your rights to sue Us for default or breach of this Agreement shall merge with the deed and Your sole and exclusive remedy for any post-Settlement default by Us under the portions of this Agreement that survive Settlement shall be limited to the lesser of (i) the cost to perform or (ii) the diminution in the Property value caused by any such default, and Our alleged default in performance shall be judged exclusively by the written performance standards defined in the Limited Warranty. You hereby waive and release all other remedies following Settlement.

**14. Claims and Disputes.** You and We agree that any and all claims arising out of or relating to this Agreement, Settlement hereunder, or improvements to the Property, regardless of legal theory, except any claims under the Limited Warranty ("Claims"), shall be subject to a one (1) year limitation of action period and bar date. Such claims based on matters occurring before the Settlement Date shall be deemed to have arisen and accrued, if at all, and the one year limitation of action period for all such claims shall begin to run on the Actual Settlement Date. All application of the so-called "discovery rule" is mutually waived by the parties. By executing this Agreement, You acknowledge Your understanding and agreement to these terms and that the said one (1) year period is completely reasonable in all respects. Notwithstanding the foregoing, these bar date terms shall not apply to claims for indemnity and/or contribution by Us against You and/or any other person. These rights may only be enforced by You and Us and nothing herein shall be construed to create any third party beneficiary rights in any other person or entity.

**15. Naturally Occurring Gases, Arsenic and Other Metals.** You agree that this Agreement is not conditioned upon testing results for naturally occurring gases, including radon, arsenic, or other elemental metals, or the presence or lack of such gases, arsenic or other elemental metals affecting the Property. Upon Settlement, You will be deemed to have accepted the Property as to the presence of these gases and/or arsenic and/or other elemental metals now or in the future and Seller shall be released from any and all claims related to or arising from the presence of any naturally occurring gases, arsenic or other elemental metals. Purchasers seeking further information should contact the U.S. Environmental Protection Agency or their state environmental protection office.

**16. Biological Impurities.** Modern building codes require that homes be constructed to slow the escape of warm air from the house during the cold months and cold air during the warmer months. These tight construction requirements could also prevent certain invisible contaminants and irritants from escaping the Home. These could include animal dander, dust, dust mites, fungi, mold, bacteria and pollen, which we will call "Biological Impurities". These can be brought into the Home through the natural circulation of air, carried into the Home by people, animals or things, including building materials and, once brought into the Home, have no way of escaping. Moisture in the Home, which can be caused by the level of air conditioning or heating and natural components used in the construction of Your Home, such as wood, can cause these Biological Impurities to grow. Homeowners can take measures to minimize Biological Impurities, which measures are more fully listed in the Limited Warranty provided to You at Settlement. We are not experts in identifying Biological Impurities or any possible effects which they can cause to You or Your family. Under the Limited Warranty, We are responsible for repairing or replacing any damage caused by a defect in materials or workmanship in the original construction (please read the Limited Warranty carefully as limitations and exclusions apply). We are not responsible for any Biological Impurities that are not caused by defects in the original construction of Your Home or which are caused or made worse through Your actions or inactions.

**17. Landscaping And Storm Water Management.** You will be responsible, at Your sole cost and expense, for fully landscaping the Lot in accordance with the Homeowners Association covenants and/or guidelines (if applicable) within three (3) months after Settlement or as soon as weather will permit. If any Homeowners Association restriction or covenant is more restrictive than this Paragraph 17, then the Homeowners Association restriction shall prevail. Prior to commencing construction of the Home, We will obtain for the Property coverage under the Ohio Environmental Protection Agency ("OEPA") NPDES Construction Storm Water General Permit ("Ohio CGP"). Once We have completed all soil disturbing activities on the Property and established through hydroseeding, or other method of Our choice, a uniform vegetative cover to meet the requirements of the OEPA CGP, We will submit to OEPA a notice of termination of coverage under the Ohio CGP ("NOT") for the Property. We make no representations or warranties about permits (including OEPA permits) which may be required for future improvements or changes to the Property.

**18. Oral Statements or Promises.** Unless oral statements or promises are written into this Agreement, they are not enforceable under law. By including the terms below, You and We are making them part of this Agreement and agree to abide by these terms. THIS SECTION SHOULD NOT BE LEFT BLANK IF YOU ARE RELYING ON ANY ORAL STATEMENTS OR PROMISES. The following oral statements or promises have been made in conjunction with this Agreement and performance of each of these statements or promises is incorporated into each party's obligation to fully perform the terms of this Agreement:
NONE

**19. Insulation.** The type, size and R value of insulation to be installed in your new Home shall be at least as shown on the chart below. R means resistance to heat flow; the higher the R value, the greater the insulation power.

| LOCATION | R-VALUE* | TYPE** |
|---|---|---|

| Slab - W/O basement or slab on grade, Only. CZ 4, 5 & 6 | R-10 | 2' V Rigid Foam |
|---|---|---|
| Conditioned Crawl space | R-10 | 2" Rigid Foam |
| Un - Conditioned Crawl space | R-19 | 5½" Fiberglass Batt |
| Unfinished Foundation Walls to unconditioned space | R-11 (4ft from top of foundation wall) | 3½" Fiberglass Batt |
| Finished Foundation Walls to unconditioned space | R-13 | 3½" Fiberglass Batt |
| Exterior Walls | R-13 | 3½" Fiberglass Batt |
| Floors above unconditioned space to include over garages and overhangs. | R-30 | 10" Fiberglass Batt |
| Attics (flat) | R-30 | 10.25" Blown Fiberglass |
| Attics (cathedral) | R-30 | 9.5" Fiberglass Batt |

\*    This is a minimum rating; the R-value may be higher if required by local jurisdictions. The R-value as constructed will be available prior to the Actual Settlement Date.
\*\*   Thickness of fiberglass insulation provided is based on U.S. Greenfiber, LLC Cocoon2 Stabilized Cellulose Insulation. Thickness may vary from manufacturer to manufacturer; however the R value will remain the same.

**20. Community/School Information.** We include certain information in Our marketing, advertising, promotional and sales documents regarding the community for informational purposes only and such information is given to the best of Our knowledge as of the date the information is given. We make no warranties as to the accuracy or timeliness of this information and You acknowledge that this information is subject to change, that You are not relying upon such information in entering into this Agreement and none of such information is a part of this Agreement. School district and boundary information may be obtained by contacting the appropriate County or City School Board.

**21. Successors and Assigns.** This Agreement shall be binding on the parties and their heirs, legal representatives and permitted assigns. You cannot assign this Agreement without Our prior written consent, which may be withheld at Our sole discretion.

**22. Risk of Loss.** We assume the risk of loss or damage to the Property by fire or other casualty until Settlement. If such loss or damage occurs, We may terminate this Agreement and refund the Deposit to You without further liability to You. In such event, You would have no right to or interest in fire or other casualty or hazard insurance proceeds.

**23. Time is of the Essence.** TIME IS OF THE ESSENCE FOR THIS AGREEMENT. This means that the failure to do what is required within the timeframes specified in this Agreement or, if no timeframe is given, within a reasonable period, is a default under the Agreement.

**24. Picture Release.** You give Us full permission to use, publish, and copyright photographic prints and any other reproductions of the Property, or any part thereof, for advertising, publicity, and for any and all bona fide commercial purposes whatsoever.

**25. Miscellaneous.** All notices and communications under this Agreement shall be in writing, except as otherwise provided herein, and shall be deemed duly given on the date such notice is (i) mailed by U.S. postal service regular mail or certified mail, first class postage prepaid, (ii) delivered to an overnight courier for next day delivery, (iii) sent by facsimile or electronic mail with transmission verification, or (iv) delivered by personal delivery. All communication to Seller shall be sent to the address provided at the beginning of this Agreement, and if to You to the address provided on the first page of this Agreement. The parties shall be responsible for notifying each other of any change of address. This Agreement (including any notices thereof) shall not be recorded. The invalidity of any provision of this Agreement shall not affect the validity or enforceability of any other provision set forth herein. Where the context requires, words in the singular shall be substituted for the plural and vice versa, and words in the masculine shall be substituted by any gender. This Agreement, its formation and enforceability shall be governed by the laws of the State of Ohio without regard for conflicts of law principles. Any rules of interpretation wherein this Agreement is construed against its drafter are waived.

**26. Entire Agreement.** This Agreement, together with the Ohio Addendum to Purchase Agreement, the Affiliated Business Arrangement Disclosure, and all other addenda pertaining thereto are incorporated by reference and constitute the entire and final Agreement. No other prior or contemporaneous agreements, representations, promises or terms (written or oral) are part of this Agreement, but are superseded by this written Agreement. No additions or changes to this Agreement shall be valid or binding unless signed by You and Our authorized officer.

**27. Sales and Marketing Representative Acknowledgment; Broker Commission.** The Sales Representative works for Us, which means that he or she may assist You in purchasing the property, but his or her duty of loyalty is only to Us. Additionally, You warrant to Us that this sale was brought about solely by Our sales personnel and that no outside broker or salesperson was the procuring cause of this sale, unless the box below is checked.

If either box below is checked, You have engaged the services of a realtor and broker. You agree to hold Us harmless and to defend Us against any claim for compensation of any kind made by any realtor or broker in connection with this Agreement except for the realtor and broker identified below. We agree to pay Broker a commission in the amount of either:

☒    **Flat Dollar Amount** of $ __1,500.00__ ; or

☐    _____ % of _____ of $_____

The commission is payable upon disbursement of funds at Settlement. Any commission due to Broker shall not be deemed earned until Settlement and We will pay the commission to the Broker from the Settlement proceeds.

Broker Name and Address: **eXp Realty** _____
**159 Crocker Park Blvd Ste 400** _____ , **Westlake** _____ , **OH  44145** _____
Realtor Name and Address: **Austin** _____ **Bates** _____
**159 Crocker Park Blvd Ste 400** _____ , **Westlake** _____ , **OH  44145** _____

OHMASTERSALEAGT. 112221                                                    Page 6 of 10
**Print Date: 9/18/2022**

**28. Merger.** Except as specifically provided in this Agreement, all of Your rights and remedies under the Agreement shall merge with (and shall be completely extinguished and superseded by) the deed delivered to You at Settlement. The sole and only exceptions to that intended and agreed merger are those rights and remedies (if any) which are expressly defined in (a) the deed, and (b) the Limited Warranty to be issued to You at Settlement. You hereby voluntarily and expressly waive and release all contrary claims and entitlements. You agree to execute any documentation reasonably required at Settlement to further memorialize the intent of the parties stated in this Paragraph 28 and that Your rights and remedies post-Settlement shall be limited to items (a) and (b) herein. Unless otherwise expressly stated in the Agreement, all of Your obligations under the Agreement and all of the Our rights and remedies under the Agreement, including but not limited to, Paragraphs 1, 6, 7, 9(c)-(e), 11, 12(b), 13(b), 14-20, 24-28 as well as all Addenda, shall survive and shall not be merged into the deed delivered at Settlement.

**29.** THIS IS A LEGALLY BINDING CONTRACT. READ AND UNDERSTAND ALL PROVISIONS PRIOR TO SIGNING. IF YOU DO NOT UNDERSTAND, SEEK LEGAL OR OTHER COMPETENT ADVICE. IF YOU SIGN BELOW, IT SHALL BE CONCLUSIVELY PRESUMED THAT YOU HAVE FULLY READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT. YOU ACKNOWLEDGE THAT THIS AGREEMENT, AS SIGNED BY YOU ALONE, CONSTITUTES AN OFFER TO PURCHASE AND THAT THIS AGREEMENT SHALL NOT BE BINDING UPON US UNTIL EXECUTED BY ONE OF OUR VICE PRESIDENTS. THE SALESPERSON OR REPRESENTATIVE RECOMMENDING APPROVAL IS NOT SUCH A VICE PRESIDENT. YOUR OFFER SHALL BE REVOCABLE ONLY BY WRITTEN NOTICE OF REVOCATION GIVEN TO AND RECEIVED BY OUR APPLICABLE VICE PRESIDENT PRIOR TO OUR ACCEPTANCE. WE ARE NOT REQUIRED TO PROVIDE NOTICE OF OUR ACCEPTANCE TO YOU AND ACCEPTANCE OCCURS UPON SIGNATURE BY OUR VICE PRESIDENT.

PURCHASER: *Blake kedra*
—80A7B160C1D841E...

Date: 9/18/2022

*Haley Green*
—48853BFBF39D4CB...

Date: 9/18/2022

SELLER:

NVR, INC. t/a __Ryan Homes__

Date:_____

By:_____
　　　Vice President